**HAROLD LLOYD CORPORATION et al. v. WITWER.**

No. 6398.

Circuit Court of Appeals, Ninth Circuit.

April 10, 1933.

McCORMICK, District Judge, dissenting.

---

Robert C. Gortner, of Beverly Hills, Cal., Max Felix, of Los Angeles, Cal., and Alfred Sutro and Eugene M. Prince, both of San Francisco, Cal. (Lawler & Degnan, of Los Angeles, Cal., and Pillsbury, Madison & Sutro, of San Francisco, Cal., of counsel), for appellants and cross-appellees.

Harold A. Fendler and Ingle Carpenter, both of Los Angeles, Cal. (Benjamin F. Bledsoe, C. P. McCarthy, and Hill, Morgan & Bledsoe, all of Los Angeles, Cal., of counsel), for appellee and cross-appellant.

Before WILBUR and SAWTELLE, Circuit Judges, and McCORMICK, District Judge.

WILBUR, Circuit Judge.

Plaintiff appellee sought to. enjoin the exhibition of a silent photoplay filmed in 1924, entitled "The Freshman," and to recover all profits therefor derived from its exhibition upon the ground that "The Freshman" infringed the copyright of a story written by H. C. Witwer entitled "The Emancipation of Rodney." The trial court held that there was infringement, enjoined the further production of the play and ordered an accounting to determine the profits derived from the exhibition of the play alleged by the plaintiff appellee to be $2,300,000, and admitted by the defendants appellants to be over $1,000,000.

The story was sold by the author to the publishers of the Popular Magazine for $75 and copyrighted by them in 1915. In 1929 an assignment of the copyright was made to the author, the sufficiency of which is attacked by the appellants, and this action was brought. This appeal is from the interlocutory decree.

Before entering upon the legal questions involved, and a comparison of the story and the play for the purposes of determining whether the play infringed the copyright, a general statement of the situation will be of assistance.

The thread upon which the story of Rodney is strung, whether we call it plot, sequence of events, or theme, is as follows:

A young man goes to college as a freshman, aspires to be popular, meets a girl, falls in love, wins a football game and the approval of the girl. Rodney, the hero, is a young man of mediocre scholastic ability, but so extremely industrious in his studies that

he cannot even forget the cube of 206. He achieves great success in his studies at college by reason of his extreme industry and not at all by reason of intellectual brilliancy. He reads Latin and Greek for the pleasure of reading about Julius Cæser's fights and Hercules' prowess. His fellow students, however, believe him to be brilliant. They accept him as such. He evokes their respect as well as their scorn. The students stand somewhat in awe of him so that he is not given a nickname. He is not hazed. He stands apart. He feels himself isolated from his fellow students. However, he despises his intellectual accomplishments, such as they are, and his success as a scholar, and wishes to be thought a dub. He apparently is unable to understand that he could readily achieve this result by ceasing to study so hard. He has to study all night to pass the simplest examination. At the same time he has an intense ambition to be an athlete. In order to achieve success in athletics he purchases text books on athletics, studies them, practices in accordance with their directions; and purchases the uniforms used in different types of sports. Nevertheless he is conscious of his lack of ability.

Rodney meets the heroine under most embarrassing circumstances. He is in the woods, believes himself to be alone, has taken off all his clothes except his underclothes, and in accordance with the instructions contained in his text-book on boxing is sparring at a tree, when he is surprised by the heroine. He is, of course, terribly embarrassed, attempts to get into his clothes hastily, and, in his confusion, makes mistakes. Meanwhile the young lady looks on complacently, not at all embarrassed. Rodney, however, in spite of the situation, conceives a liking for the heroine. He later meets her on numerous occasions and endeavors to impress her with stories of his marvelous athletic prowess. These stories she believes for a time but finally, ascertaining that he is misrepresenting his physical condition as resulting from injuries received in a football game, thus excusing himself from athletics by false pretenses, she cuts his acquaintance.

Apparently Rodney's desire for athletics is for athletics' sake, or at least for his own sake, until he puts himself in position, by his falsehoods and braggadocio, where he feels he has to make good in the eyes of the heroine by actually playing in a football game in order to regain her interest.

The climax of the Rodney story is in the football game in which he earns fame with his schoolmates and becomes a football hero in the annals of the college. Moved by a desperate desire to redeem himself with the heroine Rodney argues for a right to go on the field in the last five minutes of the game when his college is losing, takes advantage of the silence and uncertainy of the coach and rushes on the field to take the place of a disabled player. In his excitement he forgets the signals, although he claimed to the coach to know them. The ball is thrown to him and without passing it, as the signals require, he runs down the length of the field and makes a touchdown, which not only wins the game but the plaudits of his classmates as well.

In the play the principal character is Harold Lamb, impersonated by Harold Lloyd, who also goes to college as a freshman, aspires to be popular, plays football, and in the last five minutes of a big football game is sent on the field by the coach and wins the game. There are some marked differences between the story and the play which we will note at the outset, and others which will be discussed later.

In the play Harold Lamb, the hero, on his way to college, goes into the diner on the train and is seated next to the heroine, Peggy. She is attempting to solve a cross-word puzzle and Harold helps her. They are interested in trying to find "a name for one you love," and in his enthusiasm Harold repeats several endearing terms such as "sweetheart, darling," etc., entirely without reference to the girl and wholly by reason of his absorption in the puzzle. The heroine, equally absorbed, ignores the forwardness of Harold and considers his suggestion. Neither one looks at the other. An old lady passenger, hearing the terms of endearment, makes an audible comment concerning the beauty of love between young people which Harold overhears, and becoming very much embarrassed he rushes frantically from the car. Later, he rents a room in a cheap rooming house, only to discover that the heroine is the daughter of the landlady.

The hero of "The Freshman" presents a different type from Rodney. The play is entirely silent as to Harold Lamb's mental equipment and his success or lack of it in his studies. It may be inferred from his evident stupidity that he would not be a success in his studies and that his desire for scholastic success would depend upon whether or not in his opinion it would add to his popularity. Harold Lamb does not study the subject of athletics, but does have overpower-

4

ing confidence in his ability to achieve success as an athlete. Harold desires to be popular and has ascertained to his satisfaction that one method to achieve popularity is by playing football. He therefore decides to play football. He works hard and suffers much in order to get on the team. He believes himself to have accomplished this. The coach, however, and all members of the football team, consider him a nuisance and believe that he has no talent whatever in that line, but they deceive him by giving him the impression that he has made the team as a substitute, whereas, it is intended that he should serve as a water tender and for that reason is allowed to sit on the seat with the players. The heroine ascertains that Harold, whom she apparently loves from first sight, is being made a butt of and determines to inform him of this, but refrains from doing so for fear of hurting his feelings. Harold Lamb also goes upon the field in the last five minutes of play when the score is against his team. He makes a touchdown, but instead of one successful play there are eight different plays, in each of which Harold demonstrates to the audience that he is a complete ignoramus and knows nothing about the game. On one play, although unopposed, he puts the ball down within two feet of the goal line on hearing a locomotive whistle, because the referee has told him on a previous play that when the whistle blows he must "down the ball." Harold Lamb believes in himself, takes his efforts with the utmost seriousness, has no doubt of his ability to participate in the game and win it, and actually does win it, but by a fluke, as was obvious to all concerned. Instead of becoming a football hero he is considered a boob and ridiculed as such. Harold's athletic attempts were predicated entirely upon his desire to be popular and not at all upon a desire to be an athletic success. Whether he knew it or not he had the affection of the girl from the start and there was no reason to believe that his efforts in football had anything to do with his desire to win or hold the affection of the heroine. Harold got into the game because he believed in himself, and Rodney to make good with the girl if it were possible to do so.

That there are similarities between the play and the story is manifest and we proceed to consider the legal significance of such similarities. The primary question is whether these similarities resulted from copying the story; if not, the similarities are without legal significance. The secondary question is whether the similarities are themselves so marked as to prove by such circumstantial

evidence the fact of copying, in the teeth of a denial thereof by those who produced the play.

"There can be no infringement unless there has been a copying either in whole or in part of the copyrighted work. Some copying is necessary to constitute infringement." 13 C. J. § 277, note 41, and cases.

"Since there can be no infringement of copyright without some copying the mere fact of similarity or even identity between two works does not of itself make one an infringement of the other." 13 C. J. § 278.

The rule is well stated by Judge Learned Hand in the case of Fisher, Inc., v. Dillingham (D. C.) 298 F. 145, 147: "To sustain it [an infringement suit], however, more must appear than the mere similarity or even identity, of the supposed infringement with the part in question. In this lies one distinction between a patent and a copyright. One may infringe a patent by the innocent reproduction of the machine patented, but the law imposes no prohibition upon those who, without copying, independently arrive at the precise combination of words or notes which have been copyrighted."

Judge Hand quotes with approval from a text-book by Drone on Copyright, page 205, which was also cited with approval by the Circuit Court of Appeals·of the Second Circuit in Chautauqua School v. National School, 238 F. 151, 153, as follows: "Works alike may be original.—It is not essential that any production, to be original or new within the meaning of the law of copyright, shall be different from another. Whether the composition for which copyright is claimed is the same as or different from, or whether it is like or unlike, an existing one, are matters of which the law takes no cognizance, except to determine whether the production is the result of independent labor or of copying. * * * Two or more authors may write on the same subject, treat it similarly, and use the same common materials in like manner or for one purpose. Their productions may contain the same thoughts, sentiments, ideas; they may be identical. Such resemblance or identity is material only as showing whether there has been unlawful copying. In many cases, the natural or necessary resemblance between two productions, which are the result of independent labor, will amount to substantial identity. * * * But, notwithstanding their likeness to one another, any number of productions of the same kind may be original within the meaning of the law; and no conditions as to originality are imposed on the

makers, except that each shall be the producer of that for which he claims protections."

In an effort to prove copying the plaintiff called as witnesses the following officers and agents of the appellant corporations: William R. Fraser, secretary and general manager of the Harold Lloyd Corporation; Harold Lloyd, president, in charge of the production department, and star actor of the corporation and of the play; John L. Murphy, production manager; Sam Taylor, one of the directors of "The Freshman," the other being Fred Newmeyer, who was called by the defendants. It is stated in the bill of exceptions that these witnesses were called under section 2055 of the Code of Civil Procedure of California, which permits such witnesses to be called and examined "as if under cross-examination." "The party calling such adverse witness shall not be bound by his testimony, and the testimony given by such witness may be rebutted by the party calling him for such examination by other evidence." Cal. Code Civ. Proc. § 2055. This statute has no application to a suit in equity in the federal courts. In Dravo v. Fabel, 132 U. S. 487, 10 S. Ct. 170, 171, 33 L. Ed. 421, it is stated: "While the plaintiffs were not concluded by their evidence, and might show they were mistaken, it could not be properly contended by the plaintiffs that they were unworthy of credit. The evidence must be given such weight as, under all the circumstances, it is fairly entitled to receive."

The federal rule is different in actions at law. Ward v. Morrow (C. C. A.) 15 F.(2d) 660. If we accept as true the testimony of the witnesses thus called by the appellee, there was no copying and no infringement. While ordinarily in an appeal from a decree in equity the Appellate Court does not disturb the conclusions of the trial court as to the credibility of witnesses appearing before him except for manifest error, this rule must be relaxed, if not altogether abandoned, where the party is estopped to claim that the witnesses are unworthy of credit by reason of having called them as his own witnesses. We cannot, therefore, assume on this appeal, as we otherwise might, that the trial court rejected the testimony of these witnesses as unworthy of credit, especially as there is nothing inherently improbable in their testimony. The fact that the appellee may have called these witnesses under a mistaken belief as to the applicability of section 2055, Cal. Code Civ. Proc., cannot change the rule that appellee thereby vouched for their credibility. We will proceed to weigh this evidence with the other evidence adduced by the parties to determine the question of infringement. While it was admitted by Harold Lloyd that the magazine containing the story was in his possession, he and all his office force called by the appellee as her witnesses, including those who worked on the scenario or the picture, denied that they saw or read or heard the story. They all testified it was not used at any time in the production of the play. Harold Lloyd testified that Witwer, entirely from memory, gave him the outline of the story which Witwer then stated he did not clearly remember, and that he would furnish them a copy of the magazine in order that they might determine whether they would use the story, and that he did so. The gist of this testimony offered by the appellee and corroborated by other witnesses called by the appellants, then, is that none of the people connected with the production of "The Freshman," and particularly none of the scenario staff, ever read or heard the Rodney story other than as told them by Witwer. The only direct evidence opposed to this is the testimony of Mrs. Witwer that one of the writers told her over the telephone, when she inquired about the copy of the magazine which had been left by her husband with Harold Lloyd, that Lloyd had read it. This was hearsay, but admissible as such because it constituted an admission. It appears from the testimony of William R. Fraser, general manager of Lloyd's studios, called by appellee, that he introduced Mr. Witwer to Mr. Lloyd. His testimony in regard to the story as told at that time by Witwer is as follows:

"I had known of Mr. Witwer as a writer of clever literature, for perhaps ten years having read quite a number of his stories.

"I personally introduced Mr. Witwer to Harold Lloyd, on the same day that Harold and Mr. Witwer and I went to lunch at the Armstrong Cafe on Hollywood Boulevard. I understood Mr. Witwer and Mr. Lloyd had met slightly before that. As nearly as I can remember the entire talk that we three had at the luncheon consisted of a general conversation, largely about the motion picture industry, current events, and Mr. Lloyd's pictures. I think there were comments on Mr. Witwer's work which led up to Mr. Witwer stating that quite a number of years ago he had written a story which might interest Mr. Lloyd. It had been so long ago that he could not remember all of the details, but he could give us some of the high lights, and he proceeded to describe this young student type who excelled in all of his studies, was just an

outstanding marvel, the envy of all his class mates because of the fact that he answered every question correctly, and was particularly proficient in mathematics and history. There was no date in history which he couldn't recall readily. He could correct his teachers or his professors and excelled in every way in his studies. He, however, had an ambition to be recognized as an athlete but was, however, physically unfit. The conversation was broken at times when Mr. Witwer was trying to recall it, and I don't recall all of the sequences that followed, except I remember distinctly of his saying that he found one avenue of becoming an athlete or being recognized as such by having developed a formula for winning a football game. And he attempted to convince the coach that this formula would accomplish that. The coach, however, disregarded it. He respected him as a student, but didn't encourage him in the use of the formula for the team. However, in the final football game of the season with the rival college, when everything looked as though this particular college was about to lose the game, as a last resort the coach in desperation thought of this young student, who was up on the grandstand. They called him into the game and there it developed that he either forgot his formula or didn't have it, but by a fluke won the game."

Harold Lloyd, as a witness for appellee, testified similarly to the same conversation with Witwer, as follows:

"Give us as nearly as you can the statement he made as to a football story that he had written. A. Yes, sir. He had an idea of a very studious youth who was very proficient in his studies, mathematics and history. He was very good on dates, as I remember, this boy being very proficient in that particular branch, but really he longed for other things. He was very desirous of being an athlete, and he took no pride in being able to get up in the class room and answer any question the professors might put to him, which he could answer. It seems that he couldn't get on the team, so he devised—he had in his mind a system, and he told the coach he had, whereby he could win football games. It was a system he had worked out. The coach paid no attention to him at the present time. Later on in one of the large games, when they were losing—I don't recall whether he went to the coach or just what the circumstances were, but anyway the idea of his system came up, and in desperation they decided to give the boy a chance, thinking that there might be something in this system. When the boy went in to play he didn't have a

system at all; he played merely straight football. That, to the best of my recollection, is the idea Mr. Witwer told me.

"Q. Did the boy win or lose the game? A. He must have won the game. That is a point I am not absolutely sure upon. All heroes win the game."

Sam Taylor, one of the directors in the production of "The Freshman," called as a witness by the appellee, testified that he had never seen the story "The Emancipation of Rodney," and that all he knew about it was what Mr. Lloyd had told him that Mr. Witwer had told him about it. He testified as follows:

"Q. What was it that Mr. Lloyd told you about that story? A. Mr. Lloyd told me that Harry Witwer had an idea for a college story. I was interested, because we were going to make a college story. He said it was the story of a young mathematical genius, a great student, who didn't want to be a student, who wanted to be a great athlete. So far it appeared very interesting to me. Then he said that he went to college and tried to become an athlete and tried to make the football team and was a failure, but that he tried to persuade the coach that he had a formula to win football games. This he built up to some extent. They all ridiculed it at first but finally on the day of the big game, when the home team was losing, the coach, in desperation, decided to take a chance on this mysterious student who had a marvelous formula for winning football games. Up to this point I thought the story or the idea was very intriguing. So I asked Mr. Lloyd what the formula was. So he said the boy finally got in the game and his formula was to play straight football as hard as he could. My idea of that was that it was very poor construction because you were building up something and then didn't complete it. You were leading the audience to expect some marvelous formula and you gave them nothing. And I discarded it as absolutely impossible and never gave any further thought to any story by Mr. Witwer."

As to the actual use of the Rodney story Mr. Lloyd testified as follows: "Q. Mr. Lloyd, you state, do you, on your oath that you have never read the story of 'The Emancipation of Rodney' even up to the present moment? A. I positively have never read the story, 'The Emancipation of Rodney', then or even now, and I would like to state further that a story—a magazine with a story written by Mr. Witwer, or written matter from a magazine in which there is a story

by Mr. Witwer, has never been used before or during the making of 'The Freshman.' That I am positive of."

The trial court accepted this testimony and found it to be a fact that Harold Lloyd had never read the story, but by implication found that the other members of the organization had done so and copied it.

William R. Fraser testified further that it was not the practice of the Lloyd organization to use a script, and that none was used in the production of "The Freshman." He stated: "I have absolutely no knowledge of the script. I hardly ever visit the scenario department during the time that stories are being discussed or prepared, and I did not at the time this story was being handled. I am the general manager and handle the financial end and the investment end and the distribution of the picture. I have never, either as to the picture 'The Freshman', or as to any other of Mr. Lloyd's pictures, seen such a thing as a written synopsis, script, scenario or built-up written story, and there is no file at the studio or elsewhere containing any such papers to my knowledge, nor has there ever been, to my knowledge. I never knew of any script of 'The Freshman'. In the scenario department, or group of gag-men, including Mr. Lloyd, there were Mr. Sam Taylor, Mr. Ted Wild, Mr. Fred Newmeyer, Mr. Tim Whalen, Mr. J. L. Murphy and Mr. John Grey, who were recognized by me when 'The Freshman' was being made, as the gag men or story builders."

The actual method of making the picture was testified to by Mr. Fred Newmeyer, the codirector with Mr. Sam Taylor of "The Freshman," when called as a witness by the defendants, as follows:

"I am engaged as a motion picture director by the Paramount-Famous-Laskey Corporation. I became connected first with Harold Lloyd in 1913, and continued with him or the Harold Lloyd Corporation till July of '27 or '28. I was with Harold Lloyd and the Harold Lloyd Corporation during the period when the motion picture called 'The Freshman' was made, as a co-director. The other director was Sam Taylor.

"Before 'The Freshman' was made I had acted as director for Harold Lloyd in other pictures, 'Grandma's Boy,' 'The Sailor Made Man,' 'Now or Never,' 'Never Weaken,' 'Safety First,' 'Dr. Jack'; I can't remember all of them. I directed him all the way up from 'Number, Please,' but I can't remember the routine of them, in fact, all his pictures for close to ten years. Referring to 'The Freshman' in particular, the other men engaged beside Sam Taylor and myself in the preparation of the motion picture, were Johnny Grey, Timothy Whalen, Teddy Wild. Harold Lloyd, Sam Taylor and I participated in preparing the story of 'The Freshman.' Harold Lloyd was, of course, the star of the picture, and Sam Taylor and I the directors. The other three men, Ted Wild, Timothy Whalen and Johnny Grey, were what we called gag men. That is a name or term for scenario writers, story construction and putting in the business, like their gags. Usually they would sit in and work in the office all day long, and while they were preparing a sequence we would be shooting one. We would be shooting this sequence while they were preparing the next one; and then we would hold a conference after we were through shooting that sequence, and then go out and make the next one. In making 'The Freshman' we did not at any time work on a written scenario. Never in the history of Harold Lloyd pictures has there ever been a scenario since I have been with him.

"Q. How was the story imparted to the crew that did the shooting of the scenes? A. Well, after we would get through with a sequence, then we would sit in with them, and then Harold would have the last word. There was no script to shoot from. We would probably put down notes, you know, of this gag or that gag, and then shoot right from them. We have never had a scene number. We always had on our slates 'O. K.' or 'N. G.,' but no scene numbers at all. It was what we called 'shooting from the cuff.' We had a scenario room where this group that I have mentioned would meet and discuss a story, and particularly with reference to 'The Freshman,' that is the way we built the story of 'The Freshman.' To describe how the story was made, so far as I observed it, Harold's office is right around the corner from what we call the gag room. We had a long table, and we had chairs around this table, and nothing but scratch pads. We would diagram our football sequence, with our teams lined up, on a big paper. Everything we ever did do—like for instance, if we would go out with an automobile chase, we would put our great big piece of paper out here, and then we would show our automobiles and so on, where they would miss collisions and so on. And that is the way we would do with our football. We would all get together and pick out the formation, like, for instance, the gag of going down the field with a shoestring, we would all diagram that on a big piece of paper, and that would be verified. And when

we went out there, we never looked at the piece of paper; we would just go ahead and shoot. A lot of the stuff was ad lib when we were on the sets. I don't know how to explain anything more, only the boys would work, and we would come in at night and we wouldn't even see them, they would be gone home, and when we would finish that sequence we would get in a huddle on the next sequence. By getting into a huddle, I mean into conference and talk about what to do next.

"I was present when the framework of the story of 'The Freshman' was worked up or talked out. That is a long time ago. We decided to make a football picture a long time ago, and we put it off. We went out and made a lot of stock stuff out at Pasadena at a game, and we put it away. And then all of a sudden Harold said, 'Let's make a football picture,' and the first thing we did, we tried to find a gag; and a gag Harold likes, we build from that gag mostly. We get the premise of a boy who wanted to be a hero, wanted to follow the idol of last year—well, a kid that worked his way to popularity in the school by being captain of the football team. We got a very good piece of business, and Harold liked it, and we went on from there. We got the idea that to be a hero— Let's see, when he got off the train, we figured if we could put—he cut out his picture and put his picture up alongside of him, and then put it under him, and put it over him, and then the wind came in and blew it in the waste-paper basket. So he figured the first thing to do was to pave his way in college by buying ice cream cones, and we built an ice cream set, I mean a parlor, an ice cream parlor, and we threw it out; we made it and threw it out. Now, let's see, then we had the football practice, and he came with a helmet and he rapped at the door; and we had a bulldog in it, and the bulldog chased him. And we used him for a tackle, because they had broken a leg off of the dummy. And then I can remember he picked up all the paraphernalia—there was a funny gag there, where he thought he had lost his leg—he picked up all the paraphernalia and walked in to the coach and said, 'We had a great day, Coach,' and he thinks he is on the ball club, and he isn't; and the little girl tries to help him.

"Q. Now, how did you develop those various ideas? A. Through the boys working them out in the room.

"Q. Were they the suggestions of any one particular member? A. No, no. Here is the way you do; one man will get an idea, and if it is good, then somebody else will elaborate on it, and he will say something, and pretty soon maybe it is thrown out altogether, and another germ comes; so finally all those boys agree, and believe it is O. K. and then they O. K. it, and then finally call Harold in at the finish of that. Practically at all times he would say, 'don't like it,' or 'I like it,' and maybe he will elaborate on it; and if he O. K.'s it, then we go out and shoot it. But the germs are all formed right in that gag room with those boys.

"Q. During the formation of those ideas, did anyone ever mention in the gag room, or anywhere in your hearing, that Mr. Witwer, H. C. Witwer, had written a story on football? A. Not to my knowledge.

"Q. Did you ever see in the gag room or on the shooting stage, or anywhere else, while 'The Freshman' was being made, a magazine similar to the one I now show you, being a copy of Popular Magazine of November 20, 1915, which is, I believe, a duplicate of the one Mr. Fendler has filed in the Clerk's office; did you ever see this? A. No.

"Mr. Fendler. We will stipulate that Complainant's Exhibit 1 is the magazine, or a copy of the magazine, shown to the witness at that time.

"Q. This contains a story at page 120 called 'The Emancipation of Rodney,' by H. C. Witwer. Did you ever see that before this very minute, Mr. Newmeyer? A. No, I never saw it; no, sir, I did not.

"Q. Did you ever hear Mr. Lloyd or Mr. Taylor or any of the other men whom you have mentioned as connected with 'The Freshman,' did you ever hear any one of them mention this story by Mr. Witwer? A. No, I did not. In directing the making of the various scenes, no one had any such magazine on the stage or on the set, that I know of.

"Q. As a co-director, you were not then guided in any way by any story such as 'The Emancipation of Rodney,' which I have just shown you? A. No, I don't know a thing about it.

"Q. During the production of the picture called 'The Freshman,' did you at any time change and abandon any sequences of actions and start on a new line of story? A. Sure.

"Q. You mentioned—A. The ice cream sequence was thrown out; and there was another sequence thrown out, and I can't remember what it was.

"Mr. Gortner. I know what it was, and

I can suggest it to you, if there is no objection.

"Mr. Fendler. That is all right.

"A. Just give me a line, and I will tell it to you.

"Q. By Mr. Gortner. Well, was there a sequence that you will perhaps recognize as the Lester Laurel sequence? A. Oh, yes. I will tell you what it is. He was following an actor and went into a motion picture theater to see this most popular picture actor, and he came out and got into an automobile and went down the street, and as he came out of the automobile he asked him to show him that step, a jig step, and that is where he got the step. We were over footage. It was a good gag, a good plan to show where he got that step, but we couldn't use it because we were away over footage.

"As to what portion of the story of 'The Freshman' was made first,—we went up to Berkeley to shoot some stock stuff, and took Harold clean down the field with his shoe off; and I don't know whether we started that football with the practice first; I am not sure. I don't know where we did start that thing. We used to jump, you know. I swear I couldn't tell you. At Berkeley, we took Harold up, and just before the game we ran him down the field, and we had the men tackle him, and the only thing he had left was his shoe—I mean he took one shoe off and went on down for a touchdown. I think that was taken out; I am not positive of that. I think that was the Berkeley and Stanford game.

"Q. Shooting, according to the records, started October 13, 1924.

"Mr. Fendler. If it will be of any assistance, the big game was played about the 20th of November.

"A. Then I guess we started the football action first; I don't remember; I couldn't tell you to save my soul. We did a lot of jumping around, I know.

"The titles to 'The Freshman' were made up after the picture was finished. That was always the custom with a Lloyd picture. I had nothing to do with writing the titles. The titles include both the written explanatory matter and the dialogue that is thrown in.

"Sam Taylor participated in the huddles or conferences among the gag men in making up the story and the various gags more so than I. He was the head of the gag department. I remember that Walter Lundeen and Henry Kohler went out to Pasadena at the time I spoke of to take some football pictures

years ago for Harold; they were cameramen. It was before we made 'Why Worry,' and that was out on the Roach lot, while Harold Lloyd still worked on the Hal Roach lot in Culver City. At that time I had a conversation with Harold about making a football story. We just said, 'What will we do next? Have you got any ideas?' I don't know who brought up the subject, but it sounded very good to him, and he smiled. So he said there was a game on out there, and he said, 'Let's go out and get stock stuff, because if we do decide to do it, we have got that stock stuff.' And then for some reason they changed to 'Why Worry,' because they had a chance to get this great big giant, and the stock stuff was put away. I don't know whether it is here, or whether it was burned up; that is a long time ago; but the boys went out and shot an awful lot of that film.

"This method of preparation of the story and shooting it 'from the cuff,' was typical of all of Lloyd's stories up to that time. No schedule. Harold surrounded himself from the beginning of 'Grandma's Boy' with the best available gag men. He never believed in a scenario; in fact, if he did have a scenario, he would never follow it. He said to me when I came back on my last trip, he wanted to know if I had finished a picture yet. I said 'I have finished three of them,' since I had seen him last. He said to me, 'Do you think I would gain anything by shooting from a scenario?' I said, 'No, you would just waste your time and throw it away,' because he won't follow one of those things; if he did go out there, he would change it on you; he couldn't do it, it is impossible.

"Q. Did he keep this staff of gag men year after year? A. Yes."

Cross-examination by Mr. Fendler: "Mr. Lloyd made plenty of suggestions. I really couldn't tell you anything that he suggested in connection with 'The Freshman.' That is a long time ago. Mr. Murphy would sit in and listen, but he never opened his mouth. He never contributed anything. Mr. Taylor was the head of the gag department; that corresponds to the scenario department in other studios. I never knew of a story that ever got to the gag department."

It appears from the evidence that after the scenario writers in the Lloyd organization had formulated the general story, or sequence, upon which they were to proceed in making the moving picture, Harold Lloyd and Sam Taylor again got in contact with Witwer. Lloyd was interested in ascertaining more about the football incident in the

story with a view of determining whether it could be used, he having conferred with Taylor on that subject, and the magazine containing the story having been misplaced. In this conversation with Witwer which occurred in October, 1924, before production had started, Harold Lloyd did not get more details of the magazine story from Mr. Witwer. Taylor was present at a later interview with Mr. Witwer. He was more interested in the question of copyright infringement than in Witwer's story, for he knew, as he testified, that the Rodney story was a college story, and a college story was already developed in the outline of the play "The Freshman." He testified that at the time of his second interview with Witwer some of the details of the play had been developed. We quote his testimony in that regard:

"A. We had decided that Harold was to be a small town boy. And the first sequence was to be—none of the gags were in this, you understand; they were all, or mostly all, interpolated later—Harold was to be a small town boy who was graduating from high school and was all wrapped up in the idea of going to college. He was to have read books, all about the college, read all of the college magazines and the college annual. He was to have met and followed up the career of a moving picture hero called Lester —I forget the name. He was to have met this moving picture actor at a public appearance of the actor and have asked him to advise him on how to become a great college hero, such as he was in the films. The actor, realizing the boy was an unsophisticated youth, showed him a funny little step which he did in the films when he was introduced to anyone and shook hands with them. This funny little step was part of the picture in which this college hero appeared. And under this picture on the posters was the caption 'Step right up and call me Speedy.' In other words, this moving picture actor was called Speedy in the films. Then the boy was to set out for college. That was the first sequence, you understand, and gags were to be hung on that. We did photograph that sequence and eliminated it later and it is not now in the picture. The next sequence was to show the boy's arrival at college, all bedecked in gay paraphernalia, with a college letter on his sweater, a guitar and all that sort of thing; and there was to be a routine of gags at the station, showing the college atmosphere, such as slapping the dean of the college on the back and riding off in his car by mistake and such things as that. The next sequence upon which gags were to be hung, which we had at that time, was with reference to the address of the dean in the college hall, in which Harold stumbled onto the stage by mistake and generally made a fool of himself, at which time he did his funny little step and said, 'Call me Speedy.' That sequence was to finish with the suggestion that the boy had become in a way the college boob.

"Q. This was all before you started photographing, Mr. Taylor? A. This outline was, but none of the gags.

"The next sequence was to show the boy's next step toward fame and college and that was trying for the football team. The actual physical action of the sequence was to be football training. We had a few of the gags, although most of them were put in later, where he was used as a tackling dummy, and so forth, who displayed marvelous stamina and drew the admiration, and also the pity, of the coach. There was to be a dialogue between the captain and the coach to the effect that he had tried so hard and it was a shame to tell him he couldn't make the team; the captain was to suggest to let him think he had made the team and use him as a water boy. The boy was then to go home and tell the girl that he had made the football team. The next step as an advance toward fame in college was to be the final one. As I told you before, all we knew about that was there was to be one grand splurge, in which he was to make a tremendous effort to appear the most popular man in college, which was his one ideal. And in the middle of this he was to realize they were making a fool out of him and he was to crash to earth which, as you know, is the usual dramatic construction, to build them up to their greatest heights and then knock them down. This was accomplished when the heavy, or villain, another college boy, told him that they were only making a fool of him. And he there had a scene with the girl in which he broke down and cried and realized he was a failure and they had made a fool of him. And she said, 'You should only be yourself and you would accomplish what you want.' He said, 'There is one chance left— the big game tomorrow. And, if I can get in that, I will show you.' And the girl looked at him in sympathy. Then we show the big game. Naturally, it was going against the home team and all the substitutes were hurt. And, finally, there was no alternative and they had to send this boy in. And, with a series of comedy gags, he won the game. And at the finish of the game he was really proclaimed the hero and the whole college took

up his funny little jig step which they had ridiculed earlier in the picture. That was the general outline we started on.

"* * * I subsequently saw Mr. Witwer; I don't remember the exact date but it was at the time we had completed our rough outline such as I told you, and were getting ready for production—before production started. Mr. Murphy, Mr. Witwer and myself were present, and at that time I told Mr. Witwer the story we had outlined up to that point. * * *

"Q. Did you ever have a discussion, Mr. Taylor, with Mr. Lloyd or Mr. Murphy with reference to having Mr. Witwer come out to the studio for the purpose of avoiding an infringement action which Mr. Witwer might bring against the Lloyd Corporation for unauthorized use of his material in the picture 'The Freshman'? A. I believe that was the idea of the second conference. To be more explicit, we realized that Mr. Witwer had told Mr. Lloyd an idea for a college story and that we had ourselves written a college story. The very fact that he had told him a college story we knew was a dangerous proposition; and decided to get Mr. Witwer out to the studio and lay our story before him exactly as we had it lined up and let him judge whether it was in any degree similar to his story. This we did. * * *

"A. After I outlined to Mr. Witwer the story of 'The Freshman' as we had it at the time, he said that it was nothing like his story; in fact, to his mind it was much better than his; and that if we wanted to use any of the gags in his story, we were perfectly welcome to do so. This conversation was prior to the commencement of any actual photographing of 'The Freshman.'

"Q. State whether or not at that time it was possible to change 'The Freshman' story as you had it outlined. A. It is possible to change the story at any time.

"Q. Did you rely on the entire statement he had made to you that there was no similarity, and if you wanted to, you could use any of his gags? A. No, sir. When that conference with Mr. Witwer was completed he dropped completely out of my mind, and I never gave him or his story any thought until this case came up. * * * "

Cross-examination by Mr. Fendler:

"I have a most vivid recollection of that conference, especially of Mr. Witwer's words, 'you can use any gags in my story if you see fit,' because to my mind it clearly indicated what was in Mr. Witwer's mind at the time, which later events proved to be true. I mean by that that I was very fully convinced that Mr. Witwer intended to do exactly what he did do at that time; that is, to allow us to produce the story of 'The Freshman' and later sue for plagiarism.

"I was convinced when he made that statement that was what he had in mind. I believe the purpose of asking Mr. Witwer to come to the studio was to avert infringement. I was convinced at the time he made that statement that he was going to sue for infringement. I did not communicate that conviction to Mr. Lloyd. I didn't say I kept it a secret, I may have discussed it with a few outsiders. I don't remember whether I discussed it with anyone at the studio.

"Q. At the time, as you say, you told the story of 'The Freshman' to Mr. Witwer, the details of that story hadn't been worked out, had they? A. What do you mean by 'details'?

"Q. Exactly what you meant when you testified a few days ago. A. If you mean 'gags,' no they had not.

"Q. I call your attention to your testimony on page 74 of your deposition, line 3: 'Q. When you started the production of the picture in October, 1924, were all the details of the picture then completed? A. Certainly not. If I gave you that impression, I certainly did not word my statement very well.' Did you so testify? A. Yes. I just repeated it.

"The Court. What is the precise date? Has it been fixed in the testimony? I mean the date of this interview.

"Mr. Gortner. I think it is stated as about ten days or something like that before actual photographing started, and that started on October 13, 1924.

"The Court. About the first part of October, 1924?

"Mr. Gortner. It would be about the first part of October. At this conversation I described especially the outline and as many of the gags as had then been worked out. When I finished telling him what I did he said in substance or effect: 'That is nothing like my story; it is much better than my story. If you want to use any gags out of my story, you are perfectly welcome to them.' Mr. Murphy was present at that conversation. He told Mr. Witwer that I would tell him the story, as I was possibly more familiar with it than Mr. Murphy was. That was the extent to which he took part in the conversation."

As to the same conversation, John L. Mur-

phy, appellant's production manager, testified as follows:

"I am production manager of the defendant Harold Lloyd Corporation and have been such about seven years. * * * Mr. Witwer was asked to come to the studio on that occasion by me. The purpose of his being asked to come over to the studio at that time was to tell him our story. Mr. Taylor was correct in testifying yesterday that the purpose of that meeting was so that Mr. Taylor should be told Mr. Witwer's story. Mr. Lloyd wanted Mr. Taylor to hear Mr. Witwer's story from Mr. Witwer himself; but the purpose I had in getting Mr. Witwer out was to let him also hear our story. I wanted Mr. Witwer to hear our story because the magazine had been lost and all those months had intervened, and we were much concerned over the loss of it; and being that many other producers had been worked into very embarrassing situations innocently, we wanted Mr. Witwer to hear our story, and if by any chance we had unconsciously paralleled his material, we wanted him to state so and to change it then and there. My purpose was not to avert an action for infringement by Mr. Witwer. It was to lay our cards right on the table and let Mr. Witwer know what our story was before we started photographing, and if he felt there had been any similarities or any parallels, we were ready to change it. As I remember, this was in the early part of the month, and it was before the photographing of 'The Freshman' commenced, and after we had completed an outline of the story. We had the story substantially set when I sent for Mr. Witwer. By the story being 'set' I mean after these various story conferences between Mr. Taylor and Mr. Lloyd and Mr. Grey, myself, Mr. Newmeyer, Mr. Whalen and Mr. Wild, and after they had agreed upon a story. We had been working on it six or eight weeks, I believe. The story was in the form of little scratch notes that Mr. Taylor used to keep, and I believe, a typewritten outline of about two pages which Mr. Taylor made up for his own personal guidance. I did not nor did the other gag men have a copy of that outline. Mr. Taylor used to keep those notes for himself.

"Q. I call your attention now to that portion of your deposition which was taken in my office in Hollywood on March 12, 1929, and ask you to read that portion of your deposition commencing about page 42, line 3, and reading as follows: 'When we got our story lined up we thought it was a good idea to have Mr. Witwer come out and listen to our story and let him see that we had in no way used his material. Q. What made you think of that? A. For the simple reason we had a case simmering for a couple of years against us by Owen Davis in regard to "The Nervous Wreck," and we didn't want to have any repetition; and we had Mr. Witwer come out. Q. Had you used Owen Davis' material?' Then there is an objection by your counsel and your answer: 'A. I can answer that, anyway. At that time I was not connected directly with Mr. Lloyd. I was connected with Hal Roach, so I know nothing about it, anyway. Q. Whose idea was it that you might be using some of Mr. Witwer's material in "The Freshman"? A. It was nobody's idea in particular, but owing to the fact that we had one question with Davis, we thought the fair and upright thing would be to come out in the open and lay our cards on the table, and if we had in some way unconsciously used any of his material, why, we would change it.' Did you so testify? A. Yes, sir. I don't know the date, but Mr. Fraser spoke to me about making search for the magazine, Plaintiff's Exhibit 1, and said that they had looked over Mr. Lloyd's home and hadn't been able to find it; and we just thought possibly in some way it might have found its way into Mr. Lloyd's dressing room; and as a last resort, because Mr. Fraser and Mr. Lloyd were very much put out, I had his dressing room looked over. I did it myself, alone. To the best of my memory, no one else made the search with me in the dressing room at the studio.

"Q. I call your attention to the portion of your deposition taken at my office last year. 'We were just about ready to start "The Freshman" and previous to that there had been two or three calls I believe from Mrs. Witwer and Mr. Witwer regarding the loss of the magazine and Mr. Lloyd tried to find it and Mr. Fraser spoke to me about it. We hunted all over Lloyd's dressing room for it.' To whom did you refer when you said 'We hunted all over Mr. Lloyd's dressing room' immediately following your statement that Mr. Fraser spoke to you about it? A. Possibly one of the boys,—maybe Mr. Lloyd's personal secretary, or any one of the boys—helped me move the furniture in case it had dropped behind something."

Cross-examination by Mr. Seligsberg:

"Mr. Fendler asked you whether Mr. Witwer told you or attempted to tell you the story of 'The Emancipation of Rodney'? A. Yes, sir.

"Q. There was a story he told you, but do you know whether it was the story of 'The

Emancipation of Rodney' or not? A. No, I do not.

"Q. Have you ever read 'The Emancipation of Rodney'? A. No, sir.

"Q. By the Court. Did you say that Mr. Witwer did attempt to tell the story at this meeting in October of 1924? A. Yes, your Honor. I was the one who asked Mr. Witwer to come to the meeting, and my purpose was so that the Harold Lloyd story might be told to him.

"Q. Who else were parties to that intention? That is, did you and Mr. Lloyd and Mr. Taylor agree that that was the purpose of having Mr. Witwer come there? A. That was, I believe, my idea, your Honor. * * * "

Mr. Murphy recalled. Direct examination:

"I have been on the stand before and was present in court several days ago when Sam Taylor, as a witness called by Mr. Fendler, detailed a conversation at the studio of the Harold Lloyd Corporation between Mr. Taylor, myself and Mr. Witwer, in which Taylor stated that he outlined to Witwer quite at length the story of 'The Freshman' as it was then prepared. I was present at that conversation. It was early in October, 1924, in the afternoon. We had Mr. Witwer come out, and explained to him his purpose in coming out, and Mr. Taylor started to tell the story, which was the story that he repeated here on the witness stand the other day. He outlined to him a story of a small-town boy who was getting ready to go to college and got off on the wrong foot by virtue of following the antics of a motion picture actor, from whom he got the idea that he wanted to be the most popular man in college. On his way to college he met the girl. Then he, on being taken out to the assembly hall where the student body was waiting for the dean to make the opening address, the upper classmen framed him so that he made a fool of himself in front of the entire student body. Then they told him, as one of the ways to become popular, that he would have to be a good fellow, whereupon they all lined him up to go over to the ice cream parlor where they made a fool out of him, spending his money. Later on he read where the previous popular fellow in college had been the captain of the football team, and he decided to go out for the football team, where he was rousted about and made a fool of. He was so sincere, however, that they decided not to tell him. Believing that he was on the squad by virtue of his ability, he told the girl of his success. Later he decided to throw the junior prom or the party of the year, which he did. At the end of the party the realization was brought home to him by the girl that he was just making a fool of himself and that, if he wanted to attain his aim, he should just be himself, and be natural. This dropped him away down, broken hearted. His one remaining chance to make good was in the big game, which, of course, he did.

"In addition Taylor told Witwer possibly two or three gags in the big football game and that Mr. Lloyd won the game, thereby achieving his aims.

"When Taylor got through telling him that story, Witwer said that it was a very good story, in fact that it was better than his, and mentioned that, if there were any gags he had told us that we wanted to use, it was perfectly okay. We replied that we didn't need any of his gags and that we carried a staff of our own gagmen throughout the picture. With that Witwer shook hands, wished us good luck and left.

"Q. Did you report that conversation and what Mr. Witwer had said to Harold Lloyd? A. Yes, sir.

"Q. Did you believe that Mr. Witwer was in earnest? A. Absolutely.

"Q. Did you go ahead in reliance on Mr. Witwer being in earnest and produce 'The Freshman'? A. Yes, sir. Actual photographing started, to the best of my knowledge, about a week after that conversation, and continued, I believe, until about March, 1925.

"Q. If Mr. Witwer had said to you and Taylor that your story was like his in any respect, would you have gone ahead and made the picture regardless of that?

"Mr. Fendler. That is objected to as calling for a conclusion of the witness and suggestive and leading and outside of any issue in the case.

"The Court. I think that objection should be sustained.

"Mr. Gortner. May we have an exception to this ruling, your Honor, and to the previous one on the same line?

"The Court. Yes, sir.

"Referring to the testimony of Mrs. Witwer that she had a conversation with me by telephone some time in November, 1923, and that in that conversation I said 'to tell Mr. Witwer to come to the studio to meet Sam Taylor because he was the man who was going to direct the picture,' I did not say that to Mrs. Witwer. Also it is not true as testified by Mrs. Witwer that in a conversation

with me in November or December, 1923, I said I wanted Mr. Witwer to come to the studio to discuss changes in the story. The only recollection I have of a conversation with Mrs. Witwer over the telephone was after Mr. Fraser spoke to me about looking, as a last resort, in Mr. Lloyd's dressing room to see if the magazine might have found its way out there. And at that time I remember calling up Mrs. Witwer and telling her that we had been unable to locate it. But at no time did I ever have any conversation with Mrs. Witwer on either the subject of having Witwer meet the man who was going to direct the picture or having him come to the studio to discuss changes in the story.

"Referring to the time that Mr. Witwer came to the studio in October of 1924, just before production started, and to Mrs. Witwer's testimony in which she said that I either called at her home, or called her home and said to tell Mr. Witwer that I wanted him to come to the studio and that they wanted to read him their story, this testimony is correct in so far as calling him is concerned, but I don't think I used the word 'read.' I think I said 'tell him our story. * * *'

"Yes, I testified to an outline which Mr. Taylor gave to Mr. Witwer upon a subsequent occasion. * * * My recollection as to what Mr. Taylor said upon that occasion is just about as I repeated here a few minutes ago. It is pretty hard to remember that far back just the exact gags that he was told, but that was the general outline of the story that Mr. Taylor told Mr. Witwer. To the best of my knowledge everything I have outlined here, Mr. Taylor did tell Mr. Witwer upon that occasion.

"Mr. Witwer said to Mr. Taylor and me when Mr. Taylor had completed this outline, that he liked the story very much, that he thought it was even better than his, and that if we wanted to use some of his gags, it was okay with him.

"Q. Was that all he said upon that occasion? A. I am just giving you the speech as I remember it. Then we replied to that that we had our own staff of gagmen which we carried throughout the picture to supply all the material we needed in the form of gags. The gags referred to were those which he told in a very sketchy manner the previous Saturday afternoon in a very haphazard, incoherent manner. And about the only thing that I can remember that he told was about the boy out practicing hurdling, and I believe he was practicing in his B. V. D.'s, and the girl came up and caught him doing it. That is

the only thing by Mr. Witwer that I remember. As I say, he told it in a very, very slipshod manner. That is the only gag I remember. He possibly told about three or four. As I say, it was hard to follow him in his manner of speech. I don't remember the other gags he told us about that afternoon. He did not mention the title of the story 'The Emancipation of Rodney' upon that Saturday afternoon that I remember, nor did he mention the title of any story on that Saturday afternoon to my knowledge; no, sir. "Q. Did you or did Mr. Lloyd or did Mr. Taylor upon that occasion ask him to tell any story to you? * * * A. I believe having Witwer come to the studio for the purpose of hearing our story was my idea and I think Mr. Lloyd also wanted Mr. Taylor to hear Mr. Witwer's story from Mr. Witwer direct. I believe I first suggested Mr. Witwer coming to the studio on that occasion. I wouldn't say it wasn't Lloyd's idea as it has been quite a while. But to the best of my recollection it was my idea. I had no discussion with Taylor before Witwer came to the studio upon that occasion, other than I think I told him I was having Mr. Witwer out that afternoon, and to regulate his time so he would be sure and be there. Taylor did not tell me at that time, that I remember, that Lloyd had previously told him the Witwer story or something about the Witwer story and that he didn't like the idea. * * *

"Mr. Witwer told me in substance at that time, immediately after Mr. Taylor had completed his outline, that the story which Mr. Taylor had told him was nothing like his story. But what left a memory on my mind was his statement that it was a better story than his story. I don't remember just his exact words, but the general impression was conveyed that there was no similarity, and he thought our story was better adapted to Mr. Lloyd than his. It is very possible that he said in words, substance or effect when Mr. Taylor completed his outline: 'That is nothing like my story.' I just can't remember the words, but I remember the general spirit of the conversation and he said that in substance, to the best of my recollection."

With reference to the conversation of October 4, 1924, concerning the disclosure by Taylor and Murphy to Witwer of the nature of the play proposed to be produced by the appellants, the finding of the trial court is as follows:

"That on or about the 4th day of October, 1924, H. C. Witwer was requested by said John L. Murphy, production manager em-

ployed by defendant Harold Lloyd Corporation, to come to the studio of said defendant corporation for the purpose of averting and avoiding any action for infringement which might subsequently be commenced by said Witwer against said defendant corporation based upon the use of said story 'The Emancipation of Rodney' in said motion picture photoplay 'The Freshman' and on said date said Taylor, in the presence of said Murphy, related to said Witwer some parts of said motion picture photoplay 'The Freshman,' but did not then, or at all, fully state or describe to Witwer said photoplay or the form or content thereof, and said motion picture photoplay was not completed in form or content or incident until on or about the 30th day of March, 1925.

"That defendants and each of them would have proceeded with the production of said motion picture photoplay and would have produced the same and done each and every other act done by them, or either of them, in connection with the production, release, sale and distribution of said motion picture photoplay 'The Freshman' regardless of each and every consent to the use of said story 'The Emancipation of Rodney' asserted to have been given by said Witwer to said Taylor or said Murphy and regardless of any remarks made by Witwer at any time to Taylor and Murphy, or either of them.

"That none of the defendants herein relied wholly or in part or at all upon any statement by Witwer to said Taylor or said Murphy, nor did Witwer at any time mislead the defendants or any of them, in any respect whatever in connection with the production of said motion picture photoplay 'The Freshman' or in connection with any purported authorization to use episodes or 'gags' or features or any part or portion of said story 'The Emancipation of Rodney.' "

It is not clear from this finding whether or not the trial court accepted the testimony of Taylor and Murphy as to the disclosures made by them to Witwer at that time and concluded that in so doing they did not disclose the nature and character of the play as thereafter developed. If this was the intent of the finding, it is in strict accord with the testimony given by Taylor and Murphy. On the other hand, the court may have been influenced by the fact that the testimony was given some seven years after the transaction in question and related to a conversation between the decedent Witwer and the two witnesses who were engaged in the production of the play, and for that reason discounted to some extent the accuracy of their recollection and of their testimony. In that view of the case, a critical analysis of the testimony is unnecessary, and for that reason we do not now critically examine the testimony of these witnesses. It should be stated, however, that, if accepted as true, this evidence almost completely covers the similarities between the story and the play as found by the court in the finding hereinbefore quoted, and also almost completely covered the plot and the sequence of events relied upon by the appellee as proof of an infringement as hereinafter set forth.

With reference to the question of whether or not the appellants relied upon the statement of Witwer, it is true that Taylor stated specifically that he did not rely upon the statement of Witwer, but it is obvious that in making this statement he intends to emphasize the fact that he did not then, and never did, consider that there was any chance for an infringement. If the transaction occurred as testified to by the witnesses and as found by the court, then it is obvious that the appellants did rely upon Witwer's statement because they paid no further attention to him, made no attempt to secure the moving picture rights in the copyright of the story either from Witwer or from its then owner, the publishers of the magazine, and acted then upon the theory upon which they have ever since acted, namely, that there was no infringement of the copyright in the story. The trial court found as a fact that they would have produced the play regardless of whether or not Witwer consented thereto. This is no doubt true, but Murphy testified that they would have eliminated any features that Witwer claimed a copyright on, and we see no reason to doubt this testimony, for it is obvious from a consideration of the play and the story that many, if not all, the similarities could have been readily eliminated without serious effect on the play.

The theme was fully disclosed at that time, if it is "be yourself," as both parties have stated it to be.

[redacted] Whether or not this statement by Witwer at that time could be regarded as a parol license authorizing production of the play is a question that is not pressed in the briefs and which we may not consider. It is sufficient to say that the statement by Witwer with reference to the dissimilarity between the play and the story is to be considered as an admission and as persuasive evidence that on October 4, 1924, the play, as then developed and as stated to Witwer at that time, did not infringe the copyright, and this, as

we have said, covers the theme, and, in large measure, the plot and the sequence of events relied upon by the appellee to show infringement. It is persuasive evidence that at that time there had been no copying, plagiarism, or piracy, and, if accepted, would limit our inquiry with reference to similarities to those portions of the play developed subsequent to the 4th of October, 1924.

The evidence of all who participated in the construction of the play, as gag or scenario writers, is that none of them at any time thereafter had a copy of the magazine containing the story or used it in making the play. If this is true, we have the judgment of the author of the story that the framework of the play did not copy his story and the testimony of all the producers of the play that they did not copy it. The admission of Witwer is particularly important, in view of the fact that at the time it was made the appellants knew of the general outline of the story, and Witwer knew of the general outline of the play. All the witnesses testify in effect that the producers of the play never had a more detailed knowledge of the story.

The situation thus presented by the evidence is that Harold Lloyd had planned for some years to make a college story in which the hero should participate in a football game. To that end for over a period of three or four years and long before he saw Witwer, a large number of football scenes had been photographed, that is to say, different scenes at different major games of football had been photographed with the idea that they could be utilized in connection with a college football play when it was filmed. This inchoate plan, antedating all contact with Witwer or his story, necessarily involved the use of Harold Lloyd as the hero of the play and the experiences which he would have in attending college, and numerous gags in accordance with the general set-up of all the Lloyd plays.

If all this be true, then the question of infringement is narrowed to whether or not in the subsequent development of the play there was an intentional or unintentional appropriation of incidents and sequences and scenes of the story not yet developed at the time of the conference between Witwer and Harold Lloyd in October, 1924, above referred to. This inquiry, however, involves a rejection of the testimony that these witnesses never knew or read the story, for without such knowledge there could be no copying and their production would have been original no matter how closely it resembled the story. If, however, they had read the story or knew of its contents, and if there was a subconscious memory of the story derived from such knowledge, and if the evidence was such that some unconscious and unintentional copying was disclosed by the play when produced, there might be an infringement, notwithstanding the intentions of the parties to avoid infringement. There are inherent difficulties in the application of this proposition of subconscious memory to the facts in the case at bar. The production of "The Freshman," as is indicated by the testimony of all those who participated in it, was in the main extemporaneous, that is to say, with the general background in mind each scene was developed by the very process of producing. The testimony is that over 100,000 feet of film were taken in connection with the play, only 7,000 feet of which was actually used. It is obvious from such a process that the purpose is not merely to duplicate scenes in the story or to reproduce them; indeed the story is too general in its descriptions for that, but to develop and produce scenes which would carry to the audience the general plan they had in mind. In the production of the gags there was evidently much rephotographing to get the exact sequence essential to create a laugh in the audience. None of these gags and no such sequence is in the story. Consequently there was no effort to reproduce some such humorous situation in the story, but the purpose was to create a separate distinct sequence in the case of each gag to produce laughter on the part of the audience. It is not contended that these matters were copied from the story; on the contrary, it is admitted that there is a large amount of original material in the play. There is nowhere any slavish copying of anything in the story of Rodney. Indeed, the character of Rodney is so vitally different from that of Harold Lamb that the portrayal of the character of Lamb in action must necessarily be different.

We now come to a more detailed examination of the question of the similarities between the play and the story as bearing upon the question of copying and hence of infringement. The rule in that regard is thus stated in Corpus Juris:

"Since one work may be similar to another without having been derived from, or based on, it, mere resemblance between two works does not necessarily show that the one is a piracy of the other. It is merely evidence of copying and is more or less strong according to circumstances. In the case of works of imaginative literature, or of a strikingly original character, any considerable amount of

close similarity raises a strong inference of copying. * * * In all cases, the weight of mere similarity or identity as evidence of copying depends on the likelihood of its existing in the absence of copying. * * * " 13 C. J. § 426, p. 1213.

■ "Mere priority in time does not confer a monopoly, there being a sharp distinction in this respect between copyrights and patents. Both works may be entitled to copyright, although identical, if each is an original and independent production. Such similarity or identity is merely evidence of copying—more or less strong according to circumstances and the explanations which may be made of it. It is only where the similarity or identity is due to copying from the copyrighted work that the later work may be deemed an infringement. Note 47. Thus, if a person, without making any use of a prior copyrighted work, by his own independent labor produces something similar, there is no infringement. So one work does not violate the copyright in another simply because there is a similarity between the two, if the similarity results from the fact that both works deal with the same subject, or have made use of common sources." § 278, p. 1114, 13 C. J.

Justice Story stated the rule for determining piracy in Emerson v. Davies, 8 Fed. Cas. 615, 624, No. 4,436, 3 Story, 768, as follows: "The true test of piracy or not is to ascertain whether the defendant has, in fact, used the plan, arrangements, and illustrations of the plaintiff, as the model of his own book, with colorable alterations and variations only to disguise the use thereof; or whether his work is the result of his own labor, skill, and use of common materials, and common sources of knowledge, open to all men, and the resemblances are either accidental or arising from the nature of the subject. In other words, whether the defendant's book is, quoad hoc, a servile or evasive imitation of the plaintiff's work, or a bona fide original compilation from other common or independent sources." 13 C. J. "Copyright," § 307, note 91.

In West Pub. Co. v. Edward Thompson (C. C.) 169 F. 833, 834, the court said: "Actionable infringement of copyright may consist of mere paraphrasing or avoidance of the appearance of copying while still appropriating the subject-matter, may be proved either by internal evidence, depending on the sequence of ideas and language in such numbers as inevitably compels the conclusion that the copyrighted work was the source of the infringing publication, or by direct testimony as to the manner in which the work has been done."

■ In considering the weight of the circumstantial evidence of copying derived from an analysis of similarities between the play and the story, the question of intent to copy is an important factor, although, as has been stated, an intentional copying is not a necessary element in the problem if there has been a subconscious but actual copying. The appellee relies upon deliberate and intentional copying, and not upon inadvertent or unintentional copying. While this contention is not necessarily decisive, it emphasizes the importance of the question of an intent to evasively copy the story. Did the appellants intend to use the story and to evasively copy it? Where a play or a novel has had enormous popularity so that its unprecedented success may justly be attributed to some unique quality therein, it might be assumed that some literary pirate would endeavor to discover the secret of such popularity and embody it in his own work, discarding as much of the story or drama as was believed not to be essential to the success of the story. Thus, in the case of the play "Abie's Irish Rose," with its remarkable success, it was to be expected that efforts would be made to achieve a similar success by utilizing the same popular appeal if it could be discovered and detached from the unessential in the play and given a new dress in the new play. Consequently, we would suspect that in a play dealing with an Irish Catholic family and a Jewish family and an intermarriage between them there would be an attempt to make the same appeal which popularized "Abie's Irish Rose," so that others might thus realize some of the enormous profits derived from that popular appeal. We have such a case in a moving picture play, "The Cohens and the Kellys," which was advertised as having the same appeal in moving pictures as "Abie's Irish Rose" on the stage. Notwithstanding this temptation to piracy and the similarity of the play and the moving picture drama, the latter was held recently not to be an infringement of the former. Nichols v. Universal Pictures Corp. (C. C. A.) 45 F.(2d) 119. We have here the exact reverse of that situation. The story of the "Emancipation of Rodney" was sold by its author for $75. It was copyrighted only because it was a part of a magazine which was copyrighted as a whole. After the initial sale to the magazine in 1915 the story was allowed to lie dormant. It was not separately published, it was not dramatized, there was no indication that it had any special popular appeal, and

nothing to indicate that there was any value in the moving picture rights of the copyright of the story which any one would desire to appropriate with or without compensation. It had accomplished its initial purpose as a magazine story. In this situation Harold Lloyd, an actor of international reputation, and his producing company, determined to make a silent motion picture dealing with college life and college football upon which they expected to spend large sums of money before they could get any return therefor, and upon which they actually expended about $330,000 before getting a dollar of return. They learned of the story before they began actual production, with its attendant expense. They testified that they rejected the story without reading it because of its incongruous football climax, an incongruity patent to all who read the story or noted the author's statement as to the climax thereof as he told it to Harold Lloyd as above quoted. We are expected to believe, not only that this testimony is deliberately false, but also that in the development of this moving picture play there was a deliberate and evasive attempt to appropriate the story, the "Emancipation of Rodney," without compensation to the owner of the copyright. We are to believe that Harold Lloyd, having made up his mind to produce a college play involving a football game, believing that Witwer could be of substantial assistance in writing a scenario for such a play, sent for him with the purpose of utilizing his talent in connection with the production of the moving picture play without paying him therefor, and that Witwer's statement that the play did not copy the story was procured from him by fraudulent and deliberate concealment of the real scope and character of the moving picture play. All this with the knowledge on the part of those who made this great investment that the whole thing was a colorable effort to appropriate this story which had been sold for $75 and which had remained dormant for so many years, and with the implied knowledge of the law, as appellee claims it to be, that, if the picture was a success, all the profits, and none of the hazards, would go to the owner of the copyrighted story. The evidence is that Witwer sold the moving picture rights in many of his later stories for about an average of $1,000 each. Why should Lloyd pay out over $40,000 to his literary staff for work on his play if that work had already been done and could be readily purchased and copied for a much smaller sum, as was no doubt the case? Such a contention on its face taxes our credulity. Men must be judged as reasonable beings in appraising their conduct. It is reasonable to believe that, if Harold Lloyd and his producing company desired to utilize the copyrighted story, the "Emancipation of Rodney," they could have procured the copyright for a comparatively small sum from the publishers who purchased it for $75, and also to believe that it could have been procured by some other organization or individual who was not so well known as Harold Lloyd at a merely nominal figure. At the outset of this consideration, then, we are asked to believe that to avoid this small payment the appellants took the hazard of expending over $330,000 with the knowledge that, if their literary theft was discovered, as it must be when the play is publicly exhibited, they could not hope to profit from the investment if an infringement suit was brought. We are assuming in making this statement that the copyright owner is entitled to all the profits derived from the infringing play. We do not wish to be understood as approving that doctrine which is one of the main issues in the case at bar, if infringement is found.

The finding of the trial court, in which we concur, that Lloyd never read the magazine story, is entirely inconsistent with an intent on his part to copy it. The presumption of law against wrongdoing and the evidence lead to the conclusion that there was no intentional piracy.

We now turn to a comparison of the story and the play with a view to ascertaining what circumstantial evidence there is to overcome the direct evidence that there was no copying and the inferences and presumption in favor of good faith. The rule for determining copying by comparison is succinctly and accurately stated in Corpus Juris, quoting from White-Smith Music Pub. Co. v. Apollo Co., 209 U. S. 17, 28 S. Ct. 319, 52 L. Ed. 655, 14 Ann. Cas. 628, as follows: "A copy is that which comes so near to the original as to give to every person seeing it the idea created by the original." 13 C. J. 1113, § 276, note 30. The question really involved in such comparison is to ascertain the effect of the alleged infringing play upon the public, that is, upon the average reasonable man. If an ordinary person who has recently read the story sits through the presentation of the picture, if there had been literary piracy of the story, he should detect that fact without any aid or suggestion or critical analysis by others. The reaction of the public to the matter should be spontaneous and immediate. This view is sustained in part at least by the decision of the Circuit Court of

Appeals for the Second Circuit in dealing with a plaster cast figure "Spark Plug," as an infringement of a copyrighted cartoon of such a horse (King Features Syndicate v. Fleischer, 299 F. 533, 535), where the court said:

"The question presented to us is whether manufacturing and duplicating the horse as a figure doll is a copy of the copyrighted idea of the appellant's. The Copyright Act (Comp. St. § 9517 [17 USCA § 1]) provides that any person, having complied with the provisions of the act, shall have exclusive right 'to print, reprint, publish, copy, and vend the copyrighted work.' A copy is that which *ordinary observation* would cause to be recognized as having been taken from or the reproduction of another. In White-Smith Co. v. Apollo Co., 209 U. S. 17, 28 S. Ct. [319], 323, 52 L. Ed. 655, 14 Ann. Cas. 628, the court said:

" 'What is meant by a copy? We have already referred to the *common understanding* of it as a reproduction or duplication of a thing. A definition was given by Bailey, J., in West v. Francis, 5 Barn. & Ald. 743, quoted with approval in Boosey v. Whight, 80 L. T. R. 561. He said: "A copy is that which comes so near to the original as to give to *every person seeing it* the idea created by the original." ' * * *

"The protection accorded the owner of the copyright is of the *intellectual product of the author.* It is intended to protect any species of publication which the author selects to embody his literary product." (Italics ours.)

The same test was stated by Judge Sawtelle, while sitting as a District Judge in the Southern District of California, where he adopted the language of Judge James in the earlier case of Roe-Lawton v. Hal E. Roach Studios (D. C.) 18 F.(2d) 126, 128 [Barbadillo v. Goldwyn (D. C.) 42 F.(2d) 881, 885], as follows: "Unless the public is deceived by the pictures, and led to believe that the films are a picturization of plaintiff's literary work (the *standard of the ordinary observer* being applied) then no infringement is shown." Roe-Lawton v. Hal E. Roach Studios (D. C.) 18 F.(2d) 126, 128; Frankel v. Irwin (D. C.) 34 F.(2d) 142; Nichols v. Universal Pictures Corp. (D. C.) 34 F.(2d) 145; King Features Syndicate v. Fleischer (C. C. A.) 299 F. 533. (Italics ours.)

In Frankel v. Irwin (D. C.) 34 F.(2d) 142, 144, supra, Circuit Judge Hough stated the problem in this fashion: "Counsel have furnished labored analyses of each play; the work on both sides is excellent, but is to me illustrative of the classic difficulty of not being able to see the forest for the trees. Infringement of a work of imagination is determined by the result of comparative reading *on the imagination of the reader,* not by a dissection of sentences and incidents, suitable for the study of a digest or textbook, but inherently unnatural for any man who has the kind of brains that make him able to adapt a work of fiction." (Italics ours.)

We have only to consider the dramatization of the book ."Ben Hur," discussed in Harper & Bros. v. Kalem Co. (C. C. A.) 169 F. 61, affirmed 222 U. S. 55, 32 S. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285, to understand that any spectator who had read the story "Ben Hur" would at once recognize the dramatization thereof as a deliberable attempt to reproduce the book in the form of a moving picture. There would be no question about it on the part of the spectator. With this rule in mind we take up a more detailed consideration of the points of similarity between the play and the story tending to show copying, and some of the dissimilarities tending to show an original production of the play as advanced by the respective parties.

Appellee adopts the finding of the trial court as to infringement as her statement of the similarity of the story and play. We quote from her brief as follows:

"The trial Court has found as a fact that 'substantial parts and portions of the Witwer story have been used, copied and appropriated by appellants including story structure, plot, gags, sequences of incident, event and situation, including the following plot and sequence of incident,' to-wit:

" 'A country boy of non-athletic type is ambitious to be a popular athletic college hero; he practices yells before a mirror in the privacy of his room; he is photographed wearing an unearned college letter inscribed upon his clothing, admires this photograph in secret; he meets a girl to whom he tells exaggerated stories of his athletic prowess and who is sympathetic; he longs to be called by a familiar name; he studies the literature of athletics; in his actual athletic work he is pitifully weak; he inspires in the students feelings ranging from contempt to grudging toleration; he is permitted to think himself a member of a college athletic team, when in reality he is not a part of it; he enjoys the bliss of this deception for a brief period; finally realizing that he is an object of ridicule and contempt, he resolves to throw away pretense and be his real self; his photograph picturing himself as an athletic hero is de-

stroyed; he decided that his only hope for athletic eminence and consequent popularity is to take part in the football game with his college's traditional rival; the game is going badly against the home team; the team is reduced to substantially the last available man; he grasps the coach in appeal and argument to be allowed to enter the play; he forces his way into the game, much to the team's disgust; by an extremely unusual and ridiculous play he wins for the home team; the girl justifies her faith in him; he is the hero of the hour and attains the coveted nickname.' "

The plaintiff does not state what is new or novel about this plot or sequence of events found by the trial court, or about the matter claimed to have been copied or appropriated from the story. There is nothing abnormal about a college freshman desiring to succeed in athletics or desiring to be popular or to be called by a nickname. Rodney was abnormal, because, although an exceptionally fine scholar, he desired to be considered an ignoramus. We quote from the story as follows: "Rodney's being burned with the desire to attain—illiteracy! He longed to overnight forget the cube root of two hundred and six and the age of Alexander the Great's triumphs."

The story states it thus: "This, then, was Rodney Hatch Benham, who, if some one had hailed him as 'Rod,' instead of the inevitable 'Mister,' would have given that individual his earthly possessions cheerfully. But calling this solemn-visaged æsthetic 'Rod' appealed to his fellow students about as much as addressing the president of the college as 'Doc' would—so Rodney missed the thrill the nickname would have brought, and his soul became more bitter toward the unfeeling world in general."

Rodney was neither abnormal nor unusual in that, although having developed no athletic ability, he desires to become an athlete. Harold Lamb was abnormal only in that, in his desire to be popular and to do what he thought was the popular thing to do, he committed absurdities so enormous as to immediately attract the attention of his prospective schoolmates, so that in the very first contact with him they play a number of pranks on him and take advantage of his ignorance and desire to please. With reference to the proposition that both plots involved a person who was scorned by the entire student body there is notable difference. Rodney was ignored because the student body believed him to be an extraordinary student, a bookworm whom they respected for his scholastic accomplish-

ments, but "scorned" as a "dig," and hence refused or failed to associate with him. Harold Lamb was at once accepted by the student body for what he appeared to be and was, namely, a foil for their ridicule and pranks, a small-town boy entirely unfamiliar with student life and making most egregious blunders in his approach to it. As to creating a "make-believe world" in which the hero of the story and play is an "imaginary hero," this is a generality difficult to consider as copyrightable because it is a very general belief that we all live in a make-believe world, that is to say, most people believe that the world, so far as we are concerned, is a good deal what we make of it or think it to be. It is a question also whether most boys and men do not secretly regard themselves as heroes in the world as they have made it. Certainly the idea that an individual is a hero in the world as he understands it is not novel. As to the "accomplishments existing purely in the imagination of the hero," as we understand the story, Rodney did not really believe that he had athletic accomplishment. He knew he was lying to the girl about it, and it was because of his disbelief in his ability that he avoided participating in college athletics until he felt he must do so in order to impress the heroine that he was not quite so accomplished a liar as Baron Munchausen. On the other hand, it is not clear that Harold Lamb believed that he had any accomplishments. He was determined to make good, to win popularity, to get into the football game, and he endured great hardship in order to succeed, but it is not clear that he believed that he would be successful. While appellee relies upon the synopsis of the story and play made by the trial judge in the findings as showing the elements or features in the story that are contained in the play, the appellants' brief contains 30 pages of analysis of these findings for the purpose of pointing out dissimilarities in the various items contained in the summary. In the main this analysis is correct, but we can only indicate in this opinion some of the dissimilarities between the play and the story involved in the summary by taking up some of the similarities stated by the trial court. (1) Harold was not a "country boy" but lived in a small town. Rodney's origin is not indicated. (2) Rodney's desire was to be a "successful athlete." Harold's desire was to be popular; his ambition to be an athlete was entirely subsidiary. (3) Harold was not a "nonathletic" type in the sense of being a weak physical freak. On the contrary, he is a boy of remarkable strength, which, notwithstanding his ignor-

ance and awkwardness, evokes admiration. Rodney is a physical paradox. He appears in the introduction, which is the basis for telling the story, as having been the greatest football player the college has ever produced. He substitutes in the big game and makes a spectacular run which convinces the spectators and the track captain that he was a speed marvel. Contradictorally, Rodney is also described as having the frame of a scholar, bent shoulders, six feet one inch in height, weighing 150 pounds, but appearing to weigh much less. He is unable to run for more than half a mile because of his interior mechanism. (4) Harold "practices college yells before the mirror in the privacy of his room." Rodney passed up and down before the mirror in his room "spouting such expressions as 'he is a bonehead,' 'knock him out kid,' and others equally comprehensive, until the surrounding welkin rang merrily in his ears." Harold was practicing before the mirror in order to perfect himself as a college hero in imitation of a moving picture actor whose example he emulates. In Rodney's performance before the mirror he apparently imagines himself a spectator at a prize fight. (5) "Each has a college letter inscribed upon his sweater and admires it in secrecy." Harold has a block letter sewed upon his sweater in the usual fashion authorized in the case of a college athlete who has participated in an intercollegiate game. He does not admire this in secret, but openly displays it, wearing it when he leaves the train to enter college, apparently in ignorance of its significance. Rodney, on the other hand, inks the letter on his underclothes and admires the letter in secrecy because he realized it is unearned and that his act in appropriating it is reprehensible. (6) Rodney "had himself photographed" in his underclothes and keeps the photograph buried in his trunk to be admired secretly each night before retiring. Harold had no photograph taken. (7) "Each hero meets the girl," but the method of meeting is entirely different. Rodney met his heroine Alice while he was stripped to his underclothes in what he supposed to be a secluded place and while he was performing athletic feats sparring with a tree and jumping over a fence. Harold's meeting with Peggy will be described later. (8) As to the "stories of athletic prowess" Rodney did tell his heroine of deeds of prowess "on fields of sport that made Hercules seem like an awkward weakling by comparison"; he told how he saved the day in the eleventh inning of a baseball game; how he shattered records at putting shot, throwing the discus, etc. Harold, on the other hand, made no statements concerning his prowess to his heroine Peggy. He did tell her that he had made the football team and he believed that he had done so, and his belief was based upon the fact that he had been told by the coach that he had made the team when as a matter of fact it was only intended that he should act as a water boy occupying the substitute's bench in uniform for that purpose. He believed he was a real substitute. The heroine, instead of believing this story, knows the real fact and refrains from telling Harold in order to avoid hurting his feelings. Harold told what he thought to be true; Rodney told what he knew to be false. (9) As to the point that the "heroine is sympathetic," appellants call attention to the dissimilarity in the conduct of the two girls, although the matter is quite unimportant. Alice "cut" Rodney when she believed he was fabricating a story of athletic prowess, while Peggy, knowing Harold had been deceived by his schoolmates into believing he had made the team, refrained from embarrassing him by revealing that fact to him, although her impulse was to do so. (10) With reference to the "nickname," one of the basic factors in the Rodney story is his desire for contact with his schoolmates. He wanted to be hazed instead of being let alone and was delighted, at the end of the story, when he was called "Rod." Harold, however, was hazed from the very moment he landed on the depot grounds, and before the day was over he was nicknamed "Speedy," because when called upon to make a speech he had nothing to say and in his confusion read from some notes he had taken from a talk made by his moving picture hero, "Step right up and call me Speedy." In one case the nickname was derisive, in the other affectionate. There is no indication that Harold wished to be called "Speedy" as Rodney desired to be called "Rod." (11) With reference to the "study of the literature of athletics," Rodney is specifically described as a devoted and successful student of books of instruction on athletics. "If there had been a college in this fair land that gave diplomas for dissertations on the manly art of self-defense, football, baseball, and other pastimes—where the textbooks were written by James J. Corbett and Christy Mathewson —Rodney would have been the joy of that institution's faculty." When Rodney is found boxing with the tree he is stated to be following the rules contained in chapter 6 of the book on boxing. Harold's ideals are a moving picture actor, and Chet Trask, the captain of the football team. He seeks to join the football team to attain popularity. In

one of the scenes in the picture of his room a book is shown entitled "How to Play Football," but Harold knows nothing about the game while Rodney knows all about it and has developed a formula for success. Referring to an account in the sporting section of a newspaper of a prize fight and baseball game, the story says: "This, thought Rodney, was real literature, and he disgustedly hurled away a colored magazine section telling of the wonderful archeological discoveries along the Upper Nile by Professor Boniface Pinder." With reference to a glimpse of Harold in possession of a text-book, "How to Play Football," appellants state that by measurement this passage takes up nine inches of a picture of 7,000 feet of film while Rodney's devotion to athletic literature is one of the most distinguishing and dominating characteristics of the story and occupies several pages therein. Referring to the statement, "The coach in one case, and the upper class bully in another, is compared unfavorably with Simon Legree." Of course no great significance can be attached to the use of the name "Simon Legree," the name is synonymous with cruelty and is of general usage. In the silent drama the words "Simon Legree" appear in connection with an upper classman, and the title is: "An upper class bully who made Simon Legree look like a good Samaritan." Title writer John Gray testified he had used that title before in his business of title writing. The event is wholly dissimilar from the incident in the Rodney story where the conduct of the coach upon the football field is characterized as "like Simon Legree." (12) "He inspires in the students feelings ranging from contempt to grudging toleration." According to the story and apparently based entirely upon his appearance, Rodney was at once hailed by the faculty with a delight that caused the "scorn" of the student body. The faculty saw "a shining light that would startle the world with its intellectual brilliance." Students saw "another grind who would come up to the expectations of the faculty and tell if they hazed him." On the other hand, there is no account whatever of Harold's capacity as a student. He is not a "grind" and is not despised as such. He is an object of ridicule because of his effort to imitate his moving picture hero, and his general blundering. (13) "He is generally led to think himself a member of the college athletic team when in reality he is not a part of it." This is true of Harold, who, because of his pluck in practice, was allowed to think himself a substitute while actually serving as a water boy. As appellant correctly states:

"Rodney is not rewarded but is disposed of as a nuisance. Harold is purposely and finally given a reward of merit." (14) "A photograph picturing himself as an athletic hero is discarded." This is true of Rodney only. He does tear up and burn up the photograph of himself with the black letter inked on his underwear. This was burned with his other athletic paraphernalia. Harold's picture is blown by the breeze into the wastebasket from the wall where he had placed it above that of his football hero, Chet, after he made the team.

Without further analysis of the similarities found by the court to exist between the story and the play, we will consider what is copyrightable in plot, scene, or sequence of events in the story.

The dramatic and moving picture rights of a copyrighted story do not cover words (Lowenfels v. Nathan, 2 F. Supp. 73, by Judge Woolsey, U. S. District Court of New York, December 28, 1932), voice, motions, or postures of actors [Bloom & Hamlin v. Nixon (C. C.) 125 F. 977; Savage v. Hoffmann (C. C.) 159 F. 584; Chappell & Co. v. Fields (C. C. A.) 210 F. 864, supra, citing Daly v. Palmer, 6 Blatchf. 264, Fed. Cas. No. 3552; Daly v. Webster (C. C. A.) 56 F. 483; Brady v. Daly (C. C. A.) 83 F. 1007], or a plot [Dam v. Kirk La Shelle Co. (C. C. A.) 175 F. 902, 41 L. R. A. (N. S.) 1002, 20 Ann. Cas. 1173; Stodart v. Mutual Film Corp. (C. C. A.) 249 F. 513; Nichols v. Universal Pictures Corp. (C. C. A.) 45 F. (2d) 119, 121; Frankel v. Irwin (D. C.) 34 F.(2d) 142, 143], but an original novel treatment of a theme [Nutt v. Nat. Institute Inc. (C. C. A. 2) 31 F.(2d) 236, 237, citing with approval Roe-Lawton v. Hal E. Roach Studios (D. C. S. D. Cal.) 18 F.(2d) 126, supra].

The plaintiff and appellee should be expected to state to us what it is in the story that is copyrightable as new and novel and what part of such material, if any, has been misappropriated by the appellant. Her claim may be thus stated in the language of her bill of complaint: " * * * Said motion picture photoplay entitled 'The Freshman' embodies all of the essential elements of complainant's said literary composition and story entitled 'The Emancipation of Rodney,' in substantial parts and portions thereof, including the theme, plot, story, primary, secondary, and subordinate characters and characterizations, motivation, treatment, climaxes, and sequences of incidents and situations mentioned or described in complainant's said

literary composition and story entitled 'The Emancipation of Rodney' and all of which are inextricably intermingled by defendants with other matter and material not found in complainant's said literary composition and story, in defendants' said motion picture photoplay entitled 'The Freshman.'"

In her brief her claim as to the plot is more definite and limited. She says: "Appellants deliberately copied a particular and detailed portion of the plot and sequence of incident contained in appellee's story." And there follows the plot of "The Freshman" as summarized by her, as follows: "The plot * * * is constructed around an abnormal college freshman who is scorned by the entire student body; but who creates a 'make-believe' world in which he is the imaginary hero and in which his accomplishments 'exist purely in his imagination.'"

Appellee states in her brief the "sequence of incident contained in appellee's story" which she considers to have been copied in the play, and under the general sequence thus stated compares incidents in her story with those in the play. Her general statement follows:

"The freshman is not physically adapted for athletics; and his sole knowledge of them appears to be derived from reading sport manuals; yet he seems possessed by a peculiar athletic complex.

"One of the freshman's 'most cherished possessions' is a photograph of himself which symbolizes his imaginary conquests.

"The freshman is lonely and unhappy, scorned or derided by the entire student body; he is willing to sacrifice everything in order to become popular and to be called by a nickname of his own choice.

"The unsophisticated freshman is greatly embarrassed at his first meeting with a girl who proves to be the only person who is sympathetic and encourages him (although she is not at all deceived by the untrue story of his athletic success).

"The freshman attempts to live up to his own mental image of himself by trying to win a place on a college athletic team. He is hopelessly incompetent and inexperienced, however, and his persistence results in arousing anger, amusement, and exasperation in the athletic coaches. Finally he is disposed of by the unique device of being told he has made an athletic team, although he is not even a legitimate substitute.

"Eventually the freshman realizes the futility of all his vain pretences. The destruction of his imaginary world is symbolized by the destruction of his dearly cherished photograph.

"Paradoxically, the freshman immediately determines to redeem himself in the big football game of the year; although he is not a member of the team nor a legitimate substitute and has apparently never played in a football game previously.

"Injuries to his college team in the big game give the freshman an opportunity to anxiously appeal to the coach for a chance to play; but the coach impatiently refuses to have anything to do with him.

"The freshman is not cowed or awed; but instantaneously changes from humble suppliant to determined master of the situation.

"As soon as the freshman gets out on the playing field, however, he is completely bewildered with no idea of how to proceed and his teammates berate him.

"Suddenly and paradoxically the freshman changes from a totally inexperienced and incompetent 'Dub' into a marvelous superhuman player, who, without aid from his own team, easily runs through the entire opposing team (which has successfully blocked and consistently outplayed the freshman's team for the whole game).

"This single illogical and ridiculous play —probably impossible of execution by even the most highly trained and skillful football player—is seriously received by the coach, students and players who immediately regard the freshman as 'the greatest football player the college ever produced.'

"Even the sweetheart of the freshman who has always realized his shortcomings and his total lack of real athletic ability assumes the inconsistent attitude that she always expected him to win the big football game."

In the case at bar, if it be assumed that there are such similarities between the story and the play as to provoke in the casual observer the consciousness that there is such a similarity between them, and that copying may be inferred therefrom, we are still confronted with the fact that mere similarity does not necessarily involve literary piracy or an infringement of a copyright. Such similarities then as exist would require further analysis to determine whether or not they are novel in the story and thus copyrightable. The copyright of a story only covers what is new and novel in it, so that the question of infringement involves a consideration of what is new and novel in the story to which the

author has acquired a monopoly which has been misappropriated by another. Upon this subject Judge Mayer states, in Stevenson v. Harris (D. C.) 238 F. 432, 436: "Of necessity, certain kinds of incidents must be found in many books and plays, and originality, when dealing with incidents familiar in life or fiction, lies in the association and grouping of those incidents in such a manner that the work under consideration presents a new conception or a novel arrangement of events."

The Circuit Court of Appeals of the Second Circuit, in dealing with the alleged infringement of Jack London's story, "Just Meat," by the motion picture play, "Love of Gold" (London v. Biograph Co. [C. C. A. 2, 1916], 231 F. 696, 697), said: "The plot of both the story and the picture play is this: Two thieves commit a burglary * * * and discuss, not harmoniously, the division of the plunder. Each of them succeeds, unknown to the other, in putting poison in something which the other is about to swallow. * * * The fundamental idea, common to both story and picture play, is the mutual poisoning of the criminals, who thus die by their own hands. * * * The plot is highly dramatic. * * * But it is an old one [citing Chaucer's Pardoner's Tale and other examples]. *The plot is common property; no one by presenting it with modern incidents can appropriate it by copyrighting.*" (Italics ours.)

In Dam v. Kirk La Shelle Co. (C. C. A. 2) 175 F. 902, 907, 41 L. R. A. (N. S.) 1002, 20 Ann. Cas. 1173, cited by plaintiff, the court stated the following rule as to copyright of a plot: In an action for infringement of copyright, this court recognized the obligation to protect one who prepared the framework of a play and said: "The story was but a framework * * * but the right given to an author to dramatize his work includes the right to adopt it for representation upon the stage which must necessarily involve changes, additions, and omissions. It is impossible to make a play out of a story—to represent a narrative by dialogue and action—without making changes, and a playwright who appropriates the theme [plot] of another's story cannot, in our opinion, escape the charge of infringement by adding to or slightly varying his incidents."

The rule is well settled that matters in the public domain are not copyrightable, and we understand that the appellee concedes this and limits her contentions to what she considers the novel features of the story appropriated in the play. On this subject, Weil in his work on the "Law of Copyright," states the law as follows:

Section 983: "It should also be borne steadfastly in mind, that if a work is not entirely original, there is no copyright in the unoriginal part, which will prevent its use, separately, or in combination, with matter not covered by copyright. Hence, of course, any inquiry as to infringement must exclude *permissible reproduction* of such *non-original matter.*"

Section 984: "If, on the other hand, there are truly *original thoughts* embodied in the work,—not merely in the expression of thought, but *in the thought so expressed,* then copyright exists in such *intellectual creation throughout. The scope of copyright is, then, always measured by the extent of, and nature of, the original work embodied in a creation.*" (Italics ours.)

There are other definite and well-determined limitations upon the copyrightability of a plot, or sequence of events, or theme, as it is variously called. As stated by the Circuit Court of Appeals of the Second Circuit in Daly v. Webster, 56 F. 483, 487: "It is plain that the author of such a work [a play], where various incidents, in themselves common literary property, are grouped to form a particular story, must be confined, in his claim to copyright, closely to the story he has thus composed, and that another author, who, by materially varying the incidents, materially changes the story, should not be held to be an infringer."

Weil (sections 185, 186) deals with the effect of a copyright upon dramatization rights, and particularly as to the right to the plot, as follows: "It is essential to a 'dramatic composition,'" said Lacombe, J., in the Fuller Case (C. C.), 50 F. 926, "that it should tell some story. The plot may be simple. It may be but the narration or representation of a single transaction, but it must repeat or mimic some action, speech, emotion, passion, or character, real or imaginary. When it does, it is the ideas thus expressed, which become the subject of copyright. * * * The merely mechanical movements by which effects are produced on the stage are not subjects of copyright where they convey no ideas whose arrangement makes up a dramatic composition."

The following is quoted from Weil on Copyright Law, § 187:

" * * * A combination or series of dramatic events, apart from the dialogue, may be protected by copyright. * * * (§ 188)

Daly v. Webster [C. C. A.] 56 F. 483, contains a dictum that the mere exhibition of mechanical appliances to represent incidents would not be protected but that there must be a series of events dramatically presented by actors, in a certain sequence or order, for the doctrine to apply. This decision was rendered before the days of moving picture films and is not law, in that it does not apply to such motion picture 'writings,' or plays. On the other hand, except as to motion pictures, the dictum still probably represents the law.

"It should be noted that while the cases (Daly v. Palmer, 6 Blatch, 256; Daly v. Webster, 56 F. 483) cited purport to establish the doctrine that a combination, or series, of events may be copyrighted, apart from the dialogue in which they occur, and that this is probably true, in a sense, care must be taken not to confuse the copyright in the language in which such events are described, or reflected, with the protection against the copying of the events so described or reflected, which protection results from the copyright. * * * To constitute a dramatic composition, a work must tell a connected story or series of events"—citing O'Neill v. General Film Co., 171 App. Div. 854, 157 N. Y. S. 1028.

The Circuit Court of Appeals of the Second Circuit discusses the question of novelty in a play as follows (Dymow v. Bolton, 11 F.(2d) 690, 691):

"One of the entities or things which every author tries to insert in his copyrighted work is a set of ideas; yet ideas as such are not protected. Holmes v. Hurst, 19 S. Ct. 606, 174 U. S. 82, 43 L. Ed. 904; Kalem Co. v. Harper Bros., 32 S. Ct. 20, 222 U. S. 55, 56 L. Ed. 92, Ann. Cas. 1913A, 1285.

"Just as a patent affords protection only to the means of reducing an inventive idea to practice, so the copyright law protects the means of expressing an idea; and it is as near the whole truth as generalization can usually reach that, if the same idea can be expressed in a plurality of totally different manners, a plurality of copyrights may result, and no infringement will exist.

"If one compares two dramatic compositions, whether in forms suitable for the stage or for the library, what has been called the 'fundamental plot,' the 'same old plot,' or an 'old story,' can assume any author's dressing or adornment; that author can devise and use his own way of expressing that plot, and he will not infringe. This general proposition is illustrated in London v. Biograph Co., 231 F. 696, 145 C. C. A. 582; Eichel v.

Marcin (D. C.) 241 F. 404; Stodart v. Mutual Corp. (D. C.) 249 F. 507.

"The theory is (however difficult may be its application at times) 'that the protection accorded the owner of copyright is of the intellectual product of the author.' King, etc., Syndicate v. Fleischer (C. C. A.) 299 F. 533, 536. * * *

"What, then, is the extent of similarity existing between these two plays? In each is presented an ambitious girl of at least potential charm; who is willing to have her ambition served by an ingenious young man, in financial straits. In each the man, though by wholly different means, sails very close to the winds of finance and veracity in exploiting the girl as a mold of fashion (Dymow) or a 'movie star' (Bolton). Result—gratification of ambition by girl, and requited affection on the man's part.

"This incomplete skeleton the two plays have in common, but it is with real difficulty that the flesh and blood, the incidental, yet essential, adornment and trimming, of the plays can be cut away to show similarity between a few bones. * * *

"It requires dissection rather than observation to discern any resemblance here. If there was copying (which we do not believe), it was permissible, because this mere subsection of a plot was not susceptible of copyright."

The same court later in comparing the play, "Abie's Irish Rose," and the photo drama, "The Kellys and the Cohens," above referred to, again dealt with the appropriation of the commonplace. Nichols v. Universal Pictures Corp., supra. We quote from the opinion of the court in that regard as follows: "Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended. Holmes v. Hurst, 174 U. S. 82, 86, 19 S. Ct. 606, 43 L. Ed. 904; Guthrie v. Curlett, 36 F.(2d) 694 (C. C. A. 2)."

After stating the similarities between the play and the photo drama, the court said:

"If the defendant took so much from the plaintiff, it may well have been because her amazing success seemed to prove that this was

a subject of enduring popularity. Even so, granting that the plaintiff's play was wholly original, and assuming that novelty is not essential to a copyright, there is no monopoly in such a background. Though the plaintiff discovered the vein, she could not keep it to herself; so defined, the theme was too generalized an abstraction from what she wrote. It was only a part of her 'ideas.'

"Nor does she fare better as to her characters. It is indeed scarcely credible that she should not have been aware of those stock figures, the low comedy Jew and Irishman. The defendant has not taken from her more than their prototypes have contained for many decades. If so, obviously so to generalize her copyright, would allow her to cover what was not original with her. But we need not hold this as matter of fact, much as we might be justified. Even though we take it that she devised her figures out of her brain de novo, still the defendant was within its rights.

"There are but four characters common to both plays, the lovers and the fathers. The lovers are so faintly indicated as to be no more than stage properties. They are loving and fertile; that is really all that can be said of them, and any one else is quite within his rights if he puts loving and fertile lovers in a play of his own, wherever he gets the cue. The plaintiff's Jew is quite unlike the defendant's. * * * Both are grotesque, extravagant and quarrelsome; both are fond of display; but these common qualities make up only a small part of their simple pictures, no more than any one might lift if he chose. The Irish fathers are even more unlike; the plaintiff's a mere symbol for religious fanaticism and patriarchal pride, scarcely a character at all. Neither quality appears in the defendant's, for while he goes to get his grandchild, it is rather out of a truculent determination not to be forbidden, than from pride in his progeny. For the rest he is only a grotesque hobbledehoy, used for low comedy of the most conventional sort, which any one might borrow, if he chanced not to know the exemplar.

"The defendant argues that the case is controlled by my decision in Fisher, Inc., v. Dillingham (D. C.) 298 F. 145. Neither my brothers nor I wish to throw doubt upon the doctrine of that case, but it is not applicable here. We assume that the plaintiff's play is altogether original, even to an extent that in fact it is hard to believe. We assume further that, so far as it has been anticipated by earlier plays of which she knew nothing, that fact is immaterial. Still, as we have already said, her copyright did not cover everything that might be drawn from her play; its content went to some extent into the public domain. We have to decide how much, and while we are as aware as any one that the line, wherever it is drawn will seem arbitrary, that is no excuse for not drawing it; it is a question such as courts must answer in nearly all cases. Whatever may be the difficulties a priori, we have no question on which side of the line this case falls. A comedy based upon conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible of copyright than the outline of Romeo and Juliet."

The theme, lesson, or moral of the Rodney story, is indicated in the title, "The Emancipation of Rodney." After some of his experiences he decided to "be himself." In carrying out that idea he destroys his athletic text-books and paraphernalia and is thus emancipated. His good resolution, however, was of short duration, because, although he knew he was incompetent in football, he at once rushed off to endeavor to force himself into a football squad and into a game in order that he might make good with the heroine. His resolution to "be himself" of course also involved a rejection of the absurd idea that he desired to be known as a poor student. This implied resolution was also abandoned, because after his football triumph, when asked in the recitation room to answer a question with which he was entirely familiar, he replied with an impudent answer, " 'Search me,' he drawled, and his cycle was complete." The only thing novel about this situation is the unconscious incongruity of the author who apparently made no effort to be consistent or to teach the moral lesson implied in the title.

On the other hand, Harold Lamb's determination to "be himself," if he made such a determination, came not from his own cogitation but was suggested to him by the heroine after he had been told the humiliating truth, which he was unable to observe himself, that his apparent popularity with his schoolmates was not fame, and that they accepted his hospitality in a spirit of derision and regarded him with contempt.

As to this theme, there is nothing novel in the idea of achieving success or popularity by being true to oneself and avoiding the temptation to imitate others who have achieved fame and popularity. Bishop, in his advice to law students (First Book of the Law, § 375, p. 243, published in 1867), states

the same proposition in his usual pungent style: "If, then, a young law student says, 'I will be a second Rufus Choate,' he exhibits herein a folly which argues an incapacity to be a second anything; his place on the scale is, at least, as low as two hundred. Or, if he draws an ideal pattern of a lawyer, and says, 'I will fill myself up and cut myself down to it,' he commits an equal folly."

This theme is more fully developed by Bishop in sections 374, 377, and 378:

"§ 374: Before we enter upon the consideration of particular processes of legal education, let us refresh our recollections by a few further statements of what is, and what is not, the object to be accomplished. In the first place, mind, like a tree, grows from a little germ to the perfected trunk, limbs, and overshadowing boughs. And, as there are great varieties of trees, so there are of minds. We do not plant an acorn and say we prefer a cedar, and mean to educate the little thing to be one. We may help the acorn to become a beautiful and well-proportioned oak; but we can never make a cedar of it, even a poor cedar. So education can assist the growing mind to perfect its own particular nature, but it cannot create for it a new nature, different from what it received from God.

"§ 377: * * * In other words, the wise young man will cultivate the capacity which God has given him, instead of attempting to create what is not given; thus, walking in the path of obedience to the law of nature, he will receive the reward of well-doing, in success and happiness attendant on his professional career.

"§ 378: If a young man is ambitious for a particular kind of fame, it may be mortifying to him that he cannot get it; but he had better take his mortification in advance, by turning from a path of disobedience to the law of nature, into the path of obedience, than to drink it in during a storm of scorn following an actual public failure. It is presumed, therefore, that the readers of this chapter have resolved to make most prominent those studies for which they are best adapted."

It will be seen that, considered as a theme, the story of Lloyd follows the picture thus presented by Bishop much more closely than that presented by the story of Rodney, because Harold suffered mortification and public scorn following what was an actual public failure, although it seemed to be a public success and Rodney did not. To Harold's way of thinking his touchdown and his party for his schoolmates were successes, but both were really failures, and he was told by a fellow student that what he thought was approval was really ridicule and scorn.

There is still another question to be considered in dealing with the subject of copying a story in a play where the form of expressing ideas is not by repeating the words and forms of expression contained in the story, but where the expression of ideas is in the form of theme, scenes, and sequence of events shown by silent moving pictures.

The only thing in the play approximating a duplication of a scene in the story is that in which the hero argues with the coach in reference to participating in the final plays of the football game. In each case there is an argument, but the scene, considered independently from the story and the play merely as a scene or a subordinate sequence of events, is utterly commonplace and incapable of copyright monopoly. It is immaterial, therefore, whether or not there is copying.

Each case must be determined on its own facts, and much that has been said in the discussion with reference to similarities of theme, ideas, scenes, sequence of events, etc., is said with a view of laying a foundation for weighing the circumstantial evidence of copying derived from comparison. The difficulty of determining in this manner whether there has been copying when there is no copying of the text of a story or play is very great and is adverted to by the Circuit Court of Appeals of the Second Circuit in Nichols v. Universal Film Corp., 45 F.(2d) 119, 121, 123, supra, as follows: "It is of course essential to any protection of literary property, whether at common law or under the statute, that the right cannot be limited literally to the text, else a plagiarist would escape by immaterial variations. That has never been the law, *but, as soon as literal appropriation ceases to be the test, the whole matter is necessarily at large, so that, as was recently well said by a distinguished judge, the decisions cannot help much in a new case.* Fendler v. Morosco, 253 N. Y. 281, 292, 171 N. E. 56." (Italics ours.)

After having read the critical analysis of the story and the play contained in the briefs and argument it is not easy to place oneself in the attitude of a fairly indifferent and disinterested spectator of the moving picture play, "The Freshman," but we think it is fairly clear that, given an interval of two or three weeks between a casual reading of the story and a similar uncritical view of "The Freshman," it would not occur to such a

spectator, in the absence of suggestion to that effect, that he was seeing in moving picture form the story or any part of the story of the "Emancipation of Rodney," this because of differences in the appearance, name, and character of Rodney and Harold and in the football scene. If this is true, there is no copying and no infringement. If we can see at first blush that there is no such similarity as would impress the ordinary observer, it is unnecessary to consider the question of novelty or copyrightability of such similarities as exist. We are of opinion that such similarities as exist between the play and the story, and there are many, are such as require analysis and critical comparison in order to manifest themselves. The outstanding feature, the climax of both story and play, is the football game, with necessarily some similarity, but there is nothing new and novel in that other than the unusual participation of the heroes in their respective games, and on analysis these are neither identical nor similar in scene nor in conception of the two productions, but, if this be doubted, as was done by the trial court, then it is clear that there is no such similarity as overcomes the positive testimony that there was in fact no copying. The circumstantial evidence derived from comparison of the two productions is not forceful or weighty enough to overcome the direct and positive and persuasive evidence to the contrary offered by the plaintiff herself.

 "Unless the public is deceived by the pictures, and led to believe that the films are a picturization of plaintiff's literary work (the standard of the ordinary observer being applied) then no infringement is shown." Roe-Lawton v. Hal E. Roach Studios (D. C.) 18 F.(2d) 126, 128.

Decree and findings reversed, with instructions to allow the defendants proper attorneys' fees and to enter a decree holding that there is no infringement of the copyright of the story by the play.

McCORMICK, District Judge (dissenting).

This is an appeal by Harold Lloyd Corporation, Harold Lloyd individually, and Pathe Exchange, Inc., a corporation, from an interlocutory decree in an equity suit for infringement of the copyright of a story entitled, "The Emancipation of Rodney," of which H. C. Witwer, a successful short story writer, was the author. The story was printed in and as part of the November 20, 1915, edition of the Popular Magazine, a semi-

monthly periodical owned and issued by Street & Smith, Inc., publishers, of New York City.

The complainant in the court below was the author, but, during the pendency of the suit and before the trial thereof, he died, and his widow, Sadie S. Witwer, as administratrix of his estate, was substituted as plaintiff and is the appellee in this court.

The decree from which the main appeal was taken finds infringement by each of the appellants by reason of their having produced, distributed, and exhibited a silent motion picture farce entitled "The Freshman," that was first commercially shown to the public about September 12, 1925. The decree perpetually enjoins further distribution or exhibition of the picture, and it orders the destruction of all films of the picture. In addition, the decree awards to Mrs. Witwer, in her representative capacity, an accounting from the appellants, and orders each of them to pay to her all profits that have been directly or indirectly received or derived through, from, or out of the production, distribution, or exhibition of "The Freshman" from April 11, 1926. Harold Lloyd Corporation is the producer, and Pathe Exchange, Inc., is the distributor, of the motion picture. Harold Lloyd is a noted screen star, the president and owner of practically all of the capital stock of the corporation that bears his name. He played the leading part in "The Freshman" and in a general way supervised its production.

Mrs. Witwer, being dissatisfied with the part of the interlocutory decree that limits her right to profits of the picture to those made subsequent to April 11, 1926, has filed and submitted a cross-appeal herein solely from such part of the decree. By stipulation of the parties the main and cross-appeals are before this court on one record. Both appeals will be considered and determined in this opinion. For convenience, the appellants and cross-appellees will be called the "defendants" and Mrs. Witwer, the administratrix, the appellee and cross-appellant, will be called the "plaintiff." The "Emancipation of Rodney" will be referred to as the "story" and "The Freshman" as the "picture."

The interlocutory decree rests upon special findings of fact and conclusions of law made by the court below pursuant to Equity Rule 70½ (28 USCA § 723). The opinion of the trial judge is reported in (D. C.) 46 F.(2d) 792.

The defendants assign in the main appeal many errors in the court below. They have

grouped their assignments in their briefs into six general classifications of reasons which they contend require a reversal or at least a modification of the decree.

Primarily, it is contended that there was no infringement by the defendants, because nothing in the picture was actually appropriated from the story, and, further, that, if it be held that picture matter has been copied from the story, it is of such nature as to be without the protection of the copyright statutes of the United States.

Secondly, it is claimed that the federal court is wholly without jurisdiction to enter the interlocutory decree.

Thirdly, it is urged that Street & Smith, Inc., is an indispensable party to this suit and no decree can be made in the absence of such party.

Fourthly, it is asserted that part of the profits awarded to plaintiff by the decree is barred by the statute of limitations, and in this connection the cross-appeal by plaintiff is based upon her assignments of error wherein she contends that no statute of limitations whatever is applicable to her right to recover all profits realized from the picture, but that, if it be held that any limitation does apply, the court below should have applied the four-year period instead of the three-year period covered by the decree.

Fifthly, defendants argue that the award to plaintiff of all profits of defendants since April 11, 1926 (three years prior to the commencement of the suit in the court below), is inequitable and unjust, and that, under the facts, circumstances, and conditions of the case, the court, under section 25 of the Copyright Act (17 USCA § 25) should have assessed or awarded damages in lieu of profits. (If the interlocutory decree is wholly affirmed, the money recovery will be large, as the complaint alleges the profits from the picture to have been $2,300,000, and answers admit them to be $1,000,000. The decree also allows reasonable attorneys' fees and the bond staying execution pending appeal was fixed in the trial court at $500,000.)

Finally, it is claimed that the court below abused its discretion in denying defendant's motion for rehearing upon the ground of newly discovered evidence. This motion questioned the existence of an alleged oral trust of November, 1919, whereby plaintiff claimed that the equitable title to the copyright of the story and all motion picture rights therein vested in the author, Witwer, at that time, although the legal title remained in Street & Smith, Inc., until an assignment on February 13, 1929.

On August 27, 1915, Witwer sold the story and all rights in it to a partnership of Street & Smith for the sum of $75. The story was not separately copyrighted, but was protected by the copyright issued to Street & Smith for the November 20, 1915, issue of their Popular Magazine in which it appeared. In 1917, all rights in and under the copyright were transferred from said partnership to Street & Smith, Inc., a corporation, which since that time, and until February 13, 1929, was the sole legal owner and holder of the copyright, subject, however, to a trust which the trial court found to have been made in November, 1919, by oral agreement between the author, Witwer, and one MacLean, an officer of the corporate publisher and copyright owner, whereby, in consideration of Witwer's subsequently writing a series of short stories for the Popular Magazine at an agreed price, he, (Witwer) could have all moving picture and other rights to the first eighteen stories of his, which included "The Emancipation of Rodney" that had been previously printed in the Popular Magazine. It was solely from this asserted oral agreement that the court below determined that Witwer from November, 1919, was the equitable owner of the copyright and of all moving picture rights in and to the story as well as the equitable owner of each and every cause of action for infringement that accrued subsequently, and it was upon the existence of such trust in favor of plaintiff that she was awarded all of the profits from the picture that antedate the assignment of February 13, 1929. Both of the persons whose conversation it is claimed created the trust were deceased at the time of trial and neither of them had at any time given any testimony relating to it. The only witness who gave any substantial evidence as to the existence of the claimed oral agreement of 1919 was the plaintiff, Mrs. Witwer, who testified that she was present at the alleged conversation between her husband and MacLean and heard the aforesaid agreement.

Nothing appears to have been done regarding the story or the copyright until November, 1923, when William R. Fraser, an uncle of Harold Lloyd and secretary and general manager of Harold Lloyd Corporation, arranged a meeting of Witwer and Lloyd at the latter's motion picture studio. The three men went to lunch together for the purpose of discussing the prospect of having Witwer write a story for a picture that Lloyd was to

make later. Lloyd was then producing other pictures and was so occupied almost continuously until August 9, 1924. Witwer, at luncheon, told about having written a football story some time before and stated that he had the magazine in which it was printed. He asked Lloyd if he would like to read it. Lloyd said that he would and invited Witwer to dine at his home. Witwer brought a copy of the magazine, containing the story, to Lloyd's house on November 16, 1923, the evening of the dinner, and gave it to Lloyd for the purpose of examination by him in order that it might be determined whether Witwer would write the story for a college picture that Lloyd had contemplated making. They discussed the Witwer story, but there is no direct evidence that Lloyd at any time that evening or afterwards read it. He testified that he had never read it. The opinion of the trial judge acquits Harold Lloyd of any knowledge of plagiarism, although the findings and decree of the court below contain no such express determination.

Mrs. Witwer testified, however, that, the day following the dinner, Fraser telephoned to her that Lloyd had read the story, and that Lloyd wanted Witwer to come over to the studio to discuss it, and that Witwer went over that day.

Lloyd testified that when he received the magazine on November 16, he laid it on a chest in the hall of his home and a few days later went to get it, intending to read it, but it was not there.

Within three or four weeks after the dinner at Lloyd's home, John L. Murphy, production manager of Harold Lloyd Corporation, telephoned to Witwer and asked him to come to the Lloyd studios to meet Sam Taylor, who was (a writer) in charge of the scenario department and was to be a director of the prospective college picture, to discuss changes in the story. Mrs. Witwer further testified that she accompanied her husband to the studio at that time and waited outside for about an hour while Witwer was inside. Taylor testified that before production of the picture Lloyd told him the idea of the Witwer story. Taylor, later, at the request of an attorney representing the plaintiff, some time before the trial, made a statement that Lloyd, before production of the picture, had handed him the story for reading, and that he had discussed with Lloyd and Murphy the purchase of the story. At the trial he testified that the statement was a mistake, that Lloyd had merely told him the Witwer story. The trial court found that prior to June, 1924,

and before production of the picture, Lloyd related to Taylor parts of Witwer's story. "The Emancipation of Rodney," and that at all times since November 16, 1923, defendant Harold Lloyd Corporation, officers, agents, and employees of it, were fully informed and had full knowledge concerning the story, its contents, and subject-matter. Some time during July, 1924, Mrs. Witwer asked Fraser for the return of the magazine containing the story that Witwer had delivered to Lloyd. Fraser told her it had been lost; that he would look for it around the studio, and in a few days called Mrs. Witwer and told her that he had "hunted" for it all over the studio and exerted every effort to get it, but had been unable to find it anywhere. Murphy also told Mrs. Witwer in July, 1924, that Fraser had spoken to him about the magazine, and that he had looked for it around the studio and in Lloyd's dressing room, but was also unable to find it. Physical preparation for making the picture started on August 11, 1924, and until October 13, 1924, the day that actual photographing commenced, Lloyd, Taylor, Murphy, John J. Grey, who appears to have been a scenario writer or "gag" man, as he was called in the Lloyd organization, and other members of the Lloyd organization, planned, discussed and arranged for the actual making of the picture. All of these witnesses and every other person who had anything to do with making the picture testified that he had not read the story before production of the picture. There was no scenario synopsis of the picture prepared, but, as the result of their conferences and discussion, a general typewritten outline of the picture was made by Taylor, the chief director, and was used during the making of the picture. This consisted of a succession of sequences into which thereafter and during the actual "shooting" of the picture the funny episodes or "gags" would be developed and interspersed in the picture. This outline consisted of eight or ten double-spaced pages of typewriting. There were several copies of it. The director Taylor and others also made additional rough notes in their handwriting of sequences of the proposed picture as the work progressed. The plaintiff made demand for the production of these writings in the court below, but none of them or any other writing, note, or memorandum relating or referring to or containing any part of the story or the picture was produced.

On September 27, 1924, and as the result of the conferences that had been going on between Lloyd, Taylor, Murphy, Grey, and

other staff members of the Lloyd organization, a story for the picture was substantially agreed upon and reduced to the Taylor written outline to which I have already referred. This was about six weeks after actual material preparation for the picture had commenced and approximately two weeks before photographing of scenes of the picture occurred.

On that day, Lloyd, Taylor, and Murphy decided to have Witwer come to the studio. It is not clear as to just why Witwer was asked to come to the studio on this day. However, he came and an interview between the four men took place in Lloyd's dressing room. Lloyd asked Witwer to tell his story, "The Emancipation of Rodney," to Taylor, but Witwer was in such a befuddled condition that his effort to coherently discuss either the proposed picture or his story was fruitless, and the meeting there lasted only a few minutes. It is clear, however, that at that time he did at Lloyd's request sketch to the group his story and did actually intelligently relate at least one episode of it. Murphy, after this meeting, accompanied Witwer to a place where more liquor was obtained and where further general talk about the story and the sale price of it was attempted by the two men, but without anything being accomplished.

The following week, and about October 4, Murphy again telephoned Witwer's home and asked him to come to the Lloyd studio and sent a rented automobile to bring him there. Upon his arrival, Murphy, Taylor, and Witwer discussed the proposed picture, and Taylor told Witwer the outline of it that he had prepared up to that time.

Lloyd was not present at this second meeting with Witwer, but had discussed with Taylor and Murphy the advisability of arranging it before any photographing of the picture commenced. Taylor testified that the purpose of this meeting was to avoid any infringement action which Witwer might bring against the Lloyd Corporation for any use of his material in the picture. At the conclusion of Taylor's presentation of his outline of the prospective picture Witwer, according to the testimony of Taylor and Murphy, stated that the story of the picture, as disclosed by Taylor, was nothing like his story, in fact, that it was better than his story, and that, if they (the Lloyd organization) wanted to use any of the "gags" of his (Witwer's) story, they "were perfectly welcome to do so."

The trial court found that Taylor related some parts of the picture to Witwer on October 4, 1924, but did not then or at all fully state or describe to him the photoplay "The Freshman," or the form or content thereof. The court also found that defendants were not misled by Witwer and would have produced the picture regardless of anything that Witwer said to any of them or their agents or employees, and that defendants did not rely upon any statement made by Witwer to Taylor or Murphy.

The defendants submitted the testimony of all of those who worked on the picture during the actual photographing of it. This testimony was substantially that the picture was planned and produced without any attempt at plot, and, although the outline was prepared before actual photographing commenced, it was general and by no means complete, and the picture was developed as the physical action of production took place and without reference to or use of the Witwer story in any manner.

The photographing or "shooting" of the picture was completed on March 27, 1925, and, as already stated, the picture was first publicly exhibited about September 12, 1925.

On October 2, 1925, attorneys for Witwer notified Harold Lloyd Corporation in writing that the picture was a plagiarism of the story, and demanded that steps be taken by the corporation to stop the showing of the picture and also demanded an accounting of all money received by reason of the distribution and release of the picture. This notice was directed solely to said corporation and no notice of any kind was given any other defendant prior to the filing of the bill of complaint in the court below on April 11, 1929.

On December 26, 1925, Witwer brought some kind of an action in the superior court of Los Angeles county, state of California, relating to the production and exhibition of the picture, but the record is silent as to the character of this action or all defendants named therein. It does appear that the pleadings in the state court action alleged that Witwer was not the owner of the story at that time. This state case was not further prosecuted by Witwer, and it was dismissed a few days before this suit was commenced in the court below.

The defendants continued to distribute and exhibit the picture without further interference until the filing of this action on April 11, 1929, over three and one-half years from the first public exhibition of the picture and also that length of time from the notice of plagiarism.

The right of Witwer to institute and

maintain this suit for infringement of the copyright of the story was originally based in the bill of complaint solely upon a written assignment of the copyright made February 13, 1929, by the then sole legal owner and holder of it to Witwer. During the trial, the plaintiff changed the theory of the action, and over objections of defendants introduced the testimony of the oral trust of November, 1919, and claimed equitable ownership in the copyright for motion picture rights from that date. She was also allowed; over objections of defendants, to amend the complaint by claiming such equitable ownership of the copyright for 1919, and the findings and decree of the trial court sustain her right to recover upon the 1919 trust theory as well as under the assignment of February 13, 1929. The complaint alleged infringement of the copyright of the Witwer story, not only by production and exhibition of the picture, but also by the publication and sale of a certain novelization of the picture written by Russell Holman and distributed to exploit the picture. The opinion of the trial judge states that he did not consider this novel as an infringement of the Witwer story, and the findings of fact merely state that it was received in evidence, and that it partly follows the dramatic action of the picture. There is no specification in either the opinion or the findings as to what part of the dramatic action of the picture is held to have been described or followed by the novel, and the interlocutory decree contains no reference to the novel or determination that it infringes the story. The findings are complete and comprehensive, and it is unnecessary to mention them in detail. It is sufficient to state that the court found and concluded that plaintiff was entitled to the interlocutory decree: That Witwer as assignee of the copyright properly maintained the suit for infringement, and that defendant Harold Lloyd Corporation, its agents, officers, and employees, after full notice and in disregard of the rights of Witwer, did deliberately and willfully and without permission, consent, or authorization, use, copy, and appropriate the Witwer story, and did reproduce, distribute, and exhibit it in the picture, and the picture, "The Freshman," copies, uses, appropriates, and incorporates the story "The Emancipation of Rodney" in substantial parts and portions thereof, and that at all material times Harold Lloyd and Harold Lloyd Corporation had full knowledge of the rights of Witwer and proceeded with the production, distribution, and exhibition of the picture in disregard of Witwer's rights. The court also found that Harold Lloyd Corporation became completely reimbursed for all expenses in connection with production, distribution, and exhibiton of the picture about March 20, 1926. There is no evidence or specific finding that defendant Pathe Exchange, Inc., actually had anything to do with making or producing the picture. The only definite finding relative to such defendant is that it and Harold Lloyd Corporation have presented, sold, leased, distributed, and exhibited the picture and threaten to continue to do so.

The brief of the appellee contains parallels or similarities of language in the story "The Emancipation of Rodney" and in the novel "The Freshman," and states that, because there is no writing descriptive of the picture, the parallels are used and should be considered on the infringement issue.

Although the novel has been read, I think that these parallels cannot be properly used as a basis of comparison between the story and the picture, for two reasons: First, because the novel was stated by the trial court, in the opinion, to not infringe the story, and there is nothing in the findings or in the interlocutory decree determining it to be an infringement of the story; and, second, because, by the findings and decree, it is a silent motion picture that is found to be the infringing entity, and the elements in such picture that are found to be copied are its fundamental theme or story structure, characterizations, and sequence of incidents. There are no findings that the words or verbal arrangement of the titles of the silent picture are copied from the story, and it is clear that they are not. Under these circumstances, the verbal parallels between the story and the novel are no criteria of infringement and cannot be considered.

The picture was exhibited to this court in the presence of counsel for the respective parties on the day that these appeals were argued, and it is from such observation of the picture that comparison with the story is made.

The photoplay consists of several reels and contains thousands of feet of film. It is necessary to see the motion picture in order to observe and fully appreciate the similarities and resemblances between it and the Witwer story. I have, however, prepared a description of both story and picture so that I may be able in some degree at least to point out in this opinion the features that I have found to be common to both.

### The Story.

"The Emancipation of Rodney" is a "scorn to honor" short story. It opens with

an introduction in which a venerable colored man, employed as a caretaker of Hicksville College in Hicksville, Iowa, is escorting a visitor through the campus and college buildings. In going through Briggs Hall, a trophy room is entered in which photographs of many of Hicksville's athletic stars of bygone days line the walls. The visitor particularly attracted by a picture of a tortoise-shell spectacled, thin, studious appearing youth in cap and gown, asks who it is and is proudly told, "that, sah, is Mr. Benham, the greatest football player this yere college ever produced." Expressing doubt that the nonathletic, æsthetic likeness was the one the guide referred to, the visitor is reassured that he is gazing upon Hicksville's greatest gridiron star.

The story then leads into the development of its theme and reveals to the reader how the hero, Rodney, came to emancipate himself from obscurity and scorn to popularity and esteem, substantially as follows:

When Rodney entered college his scholastic appearance deceived faculty and students. The former observed him as "a shining light that would startle the world with its intellectual brilliancy," when the latter saw nothing more than another "grind" who would meet the faculty's estimate, but who would "tell" if he were hazed.

He was a "grind" unwillingly, because, notwithstanding his erudite bearing, he found learning difficult, and only by hard study was he able to pass the easiest examinations. His burning desire was to belie appearances and be regarded as dull in the classroom, and his greatest ambition was to be a popular college athlete and to be called by the nickname "Rod" instead of being addressed as "Mister Benham," but his desired appellation was about as appealing to his fellow students as addressing the college president as "Doc" would have been.

In order to personify his sportsmanship desires, he outfitted and attired himself in athletic garb, bought, kept in his room, and studied numerous sporting publications, memorized the slang of "fans," and in the security of his room he would pace in front of the mirror orally emitting such ejaculations as "He's a bonehead," "Knock him out, kid," and others to the plaudits of imaginary crowds.

On one occasion during his freshman year when unconnected with any varsity sport he had inscribed a big capital "H" in red ink on the bosom of his "X. V. Z." underwear and had gone to a photographer and had his picture taken in this simulated athletic uniform.

This photograph he kept buried in the bottom of his trunk, and every night before retiring he would resurrect it and secretly admire it.

About a month after entering college, Rodney, one Sunday afternoon, concluded to "squander recklessly somewhere off in the open country surrounding Hicksville." He bought five metropolitan dailies in order to get the latest complete sport events and supplied himself with several boxes of candy labelled "Greatest Thing in the World for Sportsmen and Athletes." In imitation of the correct pace for a marathoner, according to his "Athletic Manual," he jogged along the country road, but after covering a short distance he had to stop from sheer exhaustion. Seeing an attractive field in which to rest, he laboriously climbed the road fence and "deposited his tired form under the first tree." After reading all of the sporting sections, he arose, took off his hat, coat, and vest, and took from his hip pocket a small book entitled "How to Box," and for the next fifteen minutes he administered to his imaginary opponent, a tree, what according to the book was a "terrible lacing." Shortly after this contest he produced a memorandum book and wrote in it: "Boxing fifteen minutes."

Another athletic venture seized him, and, surveying the locality to make sure he was unobserved, he removed his trousers and proudly stood forth in the abbreviated athletic suit in which he had been photographed. Thus regaled he attempted to clear a nearby fence, and at the fifth trial he triumphed, stumbling awkwardly on the other side. He heard a giggle and saw a few feet away "the most beautiful being Rodney had ever seen." He was greatly flustrated, abashed, and embarrassed, and ran for the tree where he had left his clothes. In his confusion it was with difficulty that he finally attired himself. The girl introduced herself as Alice Campbell and opened a conversation with Rodney that showed sympathy and interest both in his athletic propensities as well as in him personally. It was evident that this first meeting was mutually attractive and the sympathetic attitude of Alice encouraged Rodney to tell her a story of unreal athletic accomplishments.

That night Rodney in the quietude of his room recounted the romantic events of the day and regretted his boastful stories to Alice because of her attractiveness and also because he realized that he would be required to demonstrate his athletic pretentions to her in the approaching sports season at Hicksville.

She, while not a co-ed, was a frequent visitor at the college, as her father was a professor there. ·

Rodney annoyed and exasperated the college coaches for the next two months by his insistence for "a chance" to demonstrate his athletic ability. They ignored this inexperienced "dub" who had bought for himself a uniform of each particular sport mentioned in the "Athletic Manual." Finally, to get rid of his generalized demand for recognition, the different coaches matched coins to see who would be exclusively harried by him. The baseball captain lost and had to let Rodney sit on the bench in uniform as an unusable substitute for several games. These efforts to make good with Alice having proved fruitless, Rodney resorted to the deception of bandaging first his arms and then his legs so as to make it appear that he was disabled and therefore unable to participate in the season's college athletics.

One day, however, the truth was revealed to Alice, and she "saw a great light." A track meet with Hicksville's bitterest rival was scheduled for the following day and Rodney had to display some kind of an injury to explain his inability to appear in the contest. He hastily bandaged his left arm and anxiously went to meet Alice whom he saw coming into the campus. She greeted him cordially and then glancing at the bandaged arm sympathetically asked if the other one was better. Rodney had forgotten that he had displayed a bandaged right arm the day before, and, being caught in his deception, he blushed, and, by his silent confusion, confessed to her his fake personation. This incident caused a decided coolness and indifference by Alice toward Rodney. It likewise disclosed to Rodney his pseudo life and prompted him to forego athletic pretense and to devote himself naturally to things. He nevertheless still ardently desired to restore himself in the confidence of Alice and to make himself popular so that his fellow students would affectionately call him "Rod."

A crisis in his life was reached, however, when he learned that Jack Niles, captain of the football eleven, had taken Alice to a fraternity hop. He locked himself in his room, analyzed his career, found it fictitious, and firmly resolved then and there to change it. He took from the trunk his picture in the improvised athletic suit with the big crimson "H" on his shirt and tore it up, then he also tore up all the sport manuals and the memorandum book in ·which he had checked his daily exercises, wrapped the fragments in a newspaper and burned all in a secluded corner of the campus, kicked the ashes to the winds, and defiantly walked to Briggs Hall where he assured himself that a notice that he had seen Captain Jack Niles put there in the morning was still posted. This notice was an invitation to all who wanted a chance to get in the game with Gratton University to report that afternoon.

Rodney, fired with his resolution, hurried off to report.

It was just before the final period in the Hicksville-Gratton annual football game that the coach of Hicksville was berating his charges for their playing "with an eloquence that would have won any other cause and brow-beaten them until Simon Legree would have appeared a well mannered man by comparison." The score was Gratton 9, Hicksville 3.

Upon resuming play, Hicksville by a successive play of a forward pass, line plunge, and end run carried the ball some distance into Gratton territory when their strong defense made further Hicksville advance seem hopeless. Then Wainright, the quarterback, signaled for a kick, which, however, was blocked by Gratton. This unsuccessful play resulted in Wainright's recovering the ball for Hicksville, but in it he sustained injuries that necessitated his being carried off the field and out of the game.

Rodney had been seated on the players' bench with an unused substitute. He approached the coach and was about to speak to him when the coach roughly interrupted him, saying, "Heh? Oh, I can't bother with you now. We've got four minutes to go, man, and. * * *" Rodney's diffidence changed to defiance. He snatched a nose guard from a substitute and swinging the coach around to face him rapidly exclaimed, "Somebody has to go in there! I know the signals; I've studied them for weeks; let me go in for Wainright and I'll work a play that will beat them!"

The coach acquiesced, and Rodney ran out in the field and entered the game to the wonderment of the rest of the Hicksville team. He was so excited that he forgot the signals. He knew no winning or other kind of a play, and he used the pretext of knowing a play simply to get his chance to show his stamina and attain his popularity. "Come on, you dub! What's the matter? We haven't got all day," coming from his teammates cleared his head enough to cause him to remember a signal for "pass the ball," which he called, and to the amazement of the

rest of the team he took the pass from center and without regard to his interference ran with the ball in an unusual and improbable manner to the Gratton's one-yard line where he was tackled, but "with a last convulsive wiggle of his tortured body, spat dirt from his mouth and wormed his way over the goal line, dragging the Gratton tackle with him." The try for point kick was successful and the game was won. Just as the score, Hicksville 10, Gratton 9, was shown, Alice Campbell turned to her escort saying, "Didn't I tell you Rod would do it?" She excused herself to her escort, and, stepping "to the edge of the box" with "a dreamy look in her eyes" said: "I—I want to congratulate Rod!"

The story closes in a classroom of Hicksville College two days after the football game. A group of students passing outside stop in front of an open window and one of them shouts, "A locomotive for Rod." Rodney is the center of admiration of the students and is affectionately hailed by them as "Rod." His ambition had been realized and a moment later his twin desire to be considered dull in class was achieved when he stood up upon being asked a question by the professor and answered, "Search me."

### The Picture.

The silent motion picture "The Freshman" is designed as a vehicle to convey to an audience the comical youthful pranks and antics that characterize all the cinema productions of Harold Lloyd.

The picture opens with a scene in the home of Harold Lamb (played by Harold Lloyd), a boy of college entrance age who has earned and saved $485 for spending money at Tate College which he is about to enter as a freshman. His parents are discussing his thrift and effort to go to college. Mr. Lamb settled himself for an evening of comfort before a radio receiving set. Harold, a nonathletic appearing youth, is pictured upstairs in his room alone dressed in athletic attire with a red block letter "T" on the bosom of his white sweater, wearing tortoise shell spectacles standing before a mirror with a megaphone and vigorously sending into it college yells to an imaginary concourse. His room is very collegiate in appearance. Pennants, football, tennis racket, college song and yell literature being displayed therein. His father hearing the yells at first thinks that it is static in the radio and later believes that he has picked up China when recognizing his son's voice he attempts to hide his embarrassment from Mrs. Lamb and goes upstairs to investigate. In Harold's room a poster is hung on the door showing a popular motion picture actor, Lester Laurel, with the title, "I'm just a regular fellow. Step right up and call me Speedy." Harold copies the title in a small notebook. He sits on his bed and glances at an athletic manual, then opens the "Tate Yearbook 1924" to a page showing the picture of Chester A. (Chet.) Trask, the most popular man in college. As Harold looks, Trask's likeness fades and Harold's picture appears in its place.

Mr. Lamb enters the room. Harold rises, goes through a comical little jig step that he has learned from Lester Laurel, and that he thinks will be a means of popularizing himself at Tate College. The father turns to go and meeting Mrs. Lamb he gives a clumsy reproduction of the jig step and opines that if Harold imitates the actor at college he will surely meet disaster.

The opening of the fall term at Tate University is then pictorialized by showing the stadium and buildings as well as the campus and many boys and girls arriving at the college railway station. A large automobile draws up to the depot and a pompous gentleman alights. He is the dean of the college and is described as "so dignified he never married for fear his wife would call him by his first name." A college cad is shown bullying newly arrived freshmen, and a title describes him as "an upper class bully who made Simon Legree look like a good Samaritan."

Peggy, the principal girl character in the picture is then shown for the first time. She is returning by train to her home in Tate and is seated in the well-filled diner of "The Tate Limited" working out a cross-word puzzle while waiting for her meal. Harold enters the car still clad in his collegiate dress with the unearned block letter "T" on his sweater. He is seated at a table opposite Peggy. He observes her trying to solve the puzzle, and thinking that he can tell her the word she is wanting, but having never met her before, he hesitates to do so until he is reassured by her smile. He then submits several endearing words such as "Dearest," Sweetheart," and is overheard by a kindly looking elderly lady sitting near who thinks he and Peggy are lovers and who is represented as saying to them: "Isn't it wonderful to be in love." Harold is flustrated, embarrassed, and abashed and runs down the aisle, in his confusion upsetting a colored waiter with a tray of dishes.

The train reaches the college station. Harold is on the platform heavily laden with golf bag, tennis racket, fencing foils, ukelele, and suitcase. He is a stranger. Peggy gives

him a friendly wave as she passes, but otherwise he is unnoticed until his comical appearance attracts the attention of the college cad who decides to play a trick on him. In the meantime, Harold has moved near a standing passenger car and a man puffing his pipe throws a lighted match out of the car window. It falls on Harold's sweater which starts to blaze. The smoker leans out of the car window and slaps Harold on the back to extinguish the blaze. Harold thinking it is a cordial greeting bestows a similar slap on the back of a gentleman standing near him who turns and indignantly informs Harold that he has saluted in this all too familiar fashion none other than the "Dean of this College." Turning away embarrassed, Harold bumps into the cad who asks him if he has been assigned to a car to take him to the college. Harold, responding negatively, is directed to the dean's car that is parked nearby. As the cad disappears the colored chauffeur dozingly obeys a direction to go without noticing the identity of his passenger. The dean, who has been leaning against the rear fender, tumbles into the street in irate astonishment as his car starts away with Harold in it.

The automobile draws up to the stage entrance of "Tate Auditorium" for the annual address of the dean to the student body, and to the surprise of the chauffeur Harold alights with his would-be athletic paraphernalia. He enters the stage door and is sympathetically attracted by a mother cat crying for her kitten that has become stranded on a board over the stage. He climbs a pedestal and rescues the kitten, but as he is alighting with kitten in hand the cad raises the curtain and Harold is seen by the entire student body in a laughable position. He walks off the stage, but is told by the cad that he should make a speech unless he wishes to be the most unpopular man in college. He yields to this warning, and, nerving himself, walks out on the platform, fumbling with a fencing foil, he gets an electric shock from an empty footlight socket, and begins a ridiculously meaningless speech which the picture intersperses with funny incidents with the kitten that in Harold's consternation he has shoved up under his sweater. He finally looks at the small notebook and concludes with the declamation that he had learned from the actor, Lester Laurel, amid tumultuous applause from the students. He is met back stage by a group of students who all address him as "Speedy."

He is next shown inviting the group to a treat, and, as they proceed to an ice cream parlor, the group invites other students, and the party becomes a throng all treated at the sole expense of Harold.

This foolish generosity has reduced Harold's exchequer to such an extent that it becomes necessary for him to hunt modest living quarters while at Tate and he is next shown engaging a room at $3 per week in a plain-looking frame house. The landlady, upon showing him the room, apologizes for the newly soaped mirror and windows saying that she would send her daughter up to finish washing the same. Harold's shirt has been clawed by the kitten at the auditorium. He removes it and starts to mend the torn places. Looking into a clear spot in the mirror he sees Peggy with broom in hand entering the room. They are both agreeably surprised, and Peggy, noticing the needle hanging from the torn shirt, finishes the mending operation.

The college paper "Tatler" is then shown and Harold alone again in his room has cut out his own photograph that appears in the paper with a title "Speedy, the Spender." This frisky Freshman is just a regular fellow who is leaving a trail of empty ice cream cones in his dizzy dash to popularity." He pins this picture with its caption on the wall under a photograph of Chet Trask, the football hero, and standing before the two pictures he secretly admires them.

Peggy is shown at her work in the checkroom of Hotel Tate. She reads the article in the "Tatler" and has clipped out the picture, cutting off the caption, however. Harold enters the hotel and is surrounded by students who flatter him about the article. He thinks they are sincere and does not appreciate that they are simply making fun of him. While they are talking, Chet Trask appears outside in football togs and all except the cad abruptly leave Harold and flock to the football hero. The cad tells Harold that he can never be as popular as Trask unless he plays on the football team. Harold thereupon manifests his determination to thus attain popularity by bringing his fist down upon a post upon which the dean had unwittingly put his high silk hat. Harold, upon seeing the destruction that his emphasis had wrought upon the dean's hat made a quick escape, and the dean, putting on the badly crushed hat, comically walks out of the lobby.

Football practice at Tate athletic field is next shown with the rough spoken head coach berating his men and telling them their lack of fighting spirit. He points to Trask, observing that he is the only man on the team with real Tate spirit. Harold enters the field

through a gate unobserved by the coach and in "football togs suggesting a by-gone era" takes a position near the coach that Trask left to open the gate for Harold. The coach, still dwelling upon the athletic qualities of Trask, points to where he thinks Trask is standing but actually to Harold in his obsolete funny togs, saying, "There's the man to model yourselves after! He's worth more than the whole bunch of you together." A player trying to tell the coach that he is praising Harold is shoved away and Harold innocently accepts the unintended laudation. Some one pulls a blanket upon which Harold is standing and topples him and as he falls he clutches the coach for support and upsets him, arousing his ire. Trask saves Harold from bodily harm at the hands of the wrathy coach, whereupon Harold does his Lester Laurel jig, offers to shake hands with the coach, and tells him he would like to play on his football team if he does not mind. The coach disdainfully looks at Harold and inquires if he can kick a football and hands him one to punt to a man whom the coach sends down the field to receive the kick. Harold beckons the receiver further and further back and attempts the kick with the result that he kicks the ball backward over his own head and over the rear fence. Harold runs out through the gate after the ball which has rolled in front of a dog kennel. A bulldog savagely rushes out and stands guard over the ball. By a clever trick Harold gets the ball when the bulldog slips his collar and takes after Harold who barely beats the dog through the gate. Inside he drops the ball and in his excitement picks up a punching bag that is fastened to the ground that jerks him back as he starts to run to where the team is practicing. Harold then without invitation lines up with the players to practice tackling a dummy. In his turn he dives for the dummy when the man holding the cord to it pulls it away and Harold lands on his face in the sawdust pit. He makes three tries with the same result, the third time pulling the coach down with him. The coach, noting Harold's ignorance and inexperience of the game of football, orders him "to get out and stay out." Harold backs away to leave through the gate where he encounters the bulldog still ferociously waiting outside. He returns, slamming the gate on the bulldog, and is then utilized by the coach as a dummy for tackling practice by the entire team. Although very roughly handled and almost totally knocked out he has displayed such grit and stamina that upon conclusion of the practice in which he thinks he has been a qualified and accepted

player he is patted on the back by the coach, and, as reward for his spirit, Captain Trask and the coach agree to let him stay on the team as water boy while leading him to think he is a real substitute.

Harold goes home from the strenuous "practice" in a taxicab. He is so sore and lame that it is with difficulty that he slowly crawls upstairs. Peggy, who has just overheard the college cad telling other students that Harold has been made a fool of, hurries home from the hotel to tell Harold of her discovery, but before she has a chance to do so he interrupts and proudly informs her, "I have made the team," and she has not the heart to tell him the truth then. He, limping, enters the room and removes his Tatler picture from its position beneath that of Chet Trask and instead places it beside the football hero. He then reads in the latest issue of the "Tatler" a query as to which student will step forward to be the host this year of the customary Fall Frolic, which event last year had largely contributed to making Trask the most popular man in college. He ponders, walks over to the two pictures, and places his above that of Trask, and later sends out invitations to the student body as host to the Fall Frolic at Hotel Tate. Peggy is shown reading one with an expression of dismay, and students laughingly peruse the invitations and nudge one another in ridicule of Harold.

Harold orders a suit for the party from a tailor who is afflicted with dizzy spells that delay the finishing of the clothes so that on the night of the ball all the party assembles except "Speedy," who finally appears after the evening was well under way in the suit that has only been basted on account of the frequency of the tailor's dizzy spells, and, in order to render emergency treatment to the clothes in case of accident, the tailor, kit in hand, accompanies Harold to the ball. Then follow comical scenes in the ballroom depicting heroic efforts of the tailor to keep Harold's clothes on. These scenes culminate in Harold's trousers pulling apart and falling off while he is dancing with a girl. In great embarrassment and confusion he runs into a telephone booth for shelter, and, seeing a bellboy passing with a suit of clothes over his arms for a guest, he reaches out, takes the trousers and puts them on. The college cad has meanwhile been trying to force his unwelcome attentions on Peggy, who has been witnessing Harold's plight and discomfort in the ballroom from her check stand in the hotel where she was on duty. Leaning out of the booth, Harold sees the cad trying to kiss Peggy and he rushes at him, knocking him

down. The cad, ignoring Peggy's gestures imploring him not to do so, reveals to Harold that the students regard him as "the college boob" and have been "kidding" him ever since he came to college, and, pointing out to Harold students in the ballroom who are ridiculing and mimicking Harold's jig step and salutation, the cad leaves. Harold vainly tries to affect unconcern to Peggy. He, however, is overcome by the truth of the cad's revelation, but principally by Peggy's entreaty for him to throw off pretense and be true to himself by getting out and making the students like him for what he naturally is and what he can do. A scene then shows a gust of wind blowing Harold's picture from its exalted position above Trask's picture into the wastebasket. Harold's face shows that he has reached a crisis in his life, and it indicates grim determination to alter himself as well as his conduct and he says "There's just one chance left—if I ever get in that big game against Union State, I'll show them."

Harold is next seen in football togs seated on the bench near a water bucket and sponge with a Tate substitute beside him. The annual football game between Union State and Tate is on and there are but thirteen minutes left to play, with the score Tate 0, Union State 3. The college cad in the grandstand sneeringly says to his girl companion, "Look at Speedy on the bench—he still thinks he has a chance to get in the game." Peggy, also in the grandstand with her mother, waves at Harold. During the play members of Tate's team are injured in rapid succession until the last substitute is put into the game. Other injuries make Harold the only available man on Tate's bench and only a few minutes to play. Harold, uninvited, starts out to the field but is commanded back by the coach who tells him, "Why, we've just been kidding you,—you're only the water boy." Harold, dejected, sits down but immediately defiantly gets up and clutching the coach seriously exclaims, "You listen now! I wasn't kidding! I've been working—and fighting— just for this chance—and you've got to give it to me!" The coach ignores Harold's argument and the referee coming up to the coach tells him that he has had enough time out and to send in a substitute at once or forfeit the game. Harold goes into the game and calls to his teammates, "Come on you old women! Are you afraid of mussing your hair? Don't you know how to fight?" The ball is put in play, and, as the teams untangle, Harold is unconscious and at the bottom of the heap. He is put on a stretcher but shortly opens his eyes and runs back into the game.

Several ludicrous plays follow in which Harold shows utter ignorance and misunderstanding of football. Finally, with one minute left, Harold chases a Union State man to Tate's very goal line where he downs him. The ball is fumbled, and Harold recovering it runs madly and humorously the entire length of the field through all the players. He is finally tackled near Union State's goal, but dragging three tackles with him over the line he makes the touchdown and is seen at the bottom of the pile, sticking his head up and showing his face covered with white chalk just as the gun announces the end of the game. Tate 6, Union 3.

Harold is carried through the crowd on the shoulders of his team mates to the showers. As he passes Peggy, she scribbles a note and hands it to him. A group of students are shown earnestly trying to learn Harold's jig step. The picture closes with Harold so intent on reading Peggy's note "I knew you could do it—I'm so proud. I love you," that he turns on the shower still clad in his tattered football suit.

The motion picture embodies, colorfully imitates, and reproduces substantial and material parts of the Witwer story that are novel, unique, and not found in the public domain of earlier literature.

Both story and picture relate to, center in, and are built around the same locale and fundamental theme. The locale in each being an American college where football is a major athletic activity, and the basic theme in each being the advantage in life of throwing off artificiality and false personation and being natural. Each has and concerns a similar leading male character or hero, who is called Rodney Hatch Benham in the story and named Harold Lamb in the picture; each hero is a lower class college student who is dominated by an ardent desire to be popular and called by a nickname "Rod" in the story and "Speedy" in the picture; each hero is scorned by the student body and conducts himself not as a normal unpretentious college youth but in imitation of an athlete; each is inexperienced and ineligible for membership in varsity athletic teams, yet each one outfits himself with paraphernalia for participation in various college sports, and, although not on any team as an athlete, each one engages in practice with the teams and causes to be inscribed upon his clothing an unearned block letter; each hero, although actually nonathletic, carefully possesses athletic manuals and practices athletic yells before a mirror in the privacy of his room, and each one secretly ad-

mires a picture of himself in pseudo-athletic garb. Each one annoys and exasperates athletic coaches until the persistence of each is recognized by the coach giving permission to him to sit upon the bench of a college athletic team during contests, the result being, that each hero believes he is a substitute player, although every one else knows that he is not and is only being tolerated.

The first meeting of the hero with the principal girl character in both story and picture is accompanied by embarrassment and confusion, on the part of the hero; each hero tells the principal girl character (called Alice Campbell in the story and named Peggy in the picture) his unreal athletic achievements and each one believes that the girl thinks that he is a real college athlete. The girl in both story and picture expresses sympathy with the hero in his athletic protestations and desires and it is largely through the girl in both story and picture that the hero is ultimately brought to a self-analysis as well as to a determination to throw off sham and pretense and be himself—to show his real character and fighting spirit in the major football game of the year with a traditional college rival. This crisis in both story and picture is similarly disclosed.

Each hero persuades an unwilling football coach to permit him to enter the game at a crucial moment, and, although each hero is held in scorn by the team at the time and does not know the signals and is ignorant of how to play football, each hero wins the game in the final moments by running to a touchdown by an amusing and improbable play through the entire opposing team and thereby achieves his ambition to become the most popular man in college and attains the congratulations and affection of the girl and the hero worship of the entire student body. The major climax in both story and picture is substantially alike.

In the light of the evidence that showed access by some defendants to the story and conferences by some defendants and their agents with the author of the story relative to its contents and use prior to and during the production of the picture by defendants and because defendants failed to produce any manuscript, outline, or other writing of the picture made by them, or to satisfactorily show in the court below the originality of the picture, I am constrained to believe that the many substantial similarities appearing in both story and picture cannot reasonably be said to have been coincidental or independently conceived by defendants.

There are many discrepancies in the testimony of the witnesses as to the preparations for and production of the picture. There are also sharp conflicts in the evidence as to conversations with Witwer about his story and about the use of it during the making of the picture. The trial court had better opportunity than this court to determine the relative weight and effect of evidence that was given by the witnesses who personally appeared and testified in the court below, and we should not now, in the absence of plain or obvious error, undertake to disturb findings of fact that are made upon conflicts in the evidence. Gila Water Co. v. International Finance Corp. (C. C. A. 9) 13 F.(2d) 1; Easton v. Brant (C. C. A. 9) 19 F.(2d) 857; and Ætna Life Ins. Co. v. Geher (C. C. A. 9) 50 F.(2d) 657.

After a thorough consideration of the evidence and of the two opposing works as a whole, I cannot say that the findings of the trial court that Harold Lloyd Corporation, its officers, agents, and employees, copied substantial and material parts of the story and used and reproduced them in the picture, are not supported by the evidence.

In considering whether there has been an infringement, the question is: Has there been an illegal copying of a substantial part of a validly copyrighted work, not as a matter of quantity, but of quality and value?

The series of incidents that I have pointed out that are common to both story and picture are not immaterial or inconsequential to the latter. To the contrary, they constitute part of the story structure of the picture. It is true, as will readily appear from reading the two descriptions, that they have been augmented and expanded as well as interspersed with "gags" of independent origin, but these incidents by no means eliminate the common features from the picture. They remain as part, at least, of the central situation and the only effect that the additions have had upon them is to further dramatic effect in the picture. Such changes or adaptation are necessary in the visualizing before an audience of most short stories and do not evade infringement of them as long as a substantial part of the copyrighted story is copied and incorporated in the picture. The Circuit Court of Appeals for the Second Circuit in considering the effect of adaptations of short stories to the stage in Dam v. Kirk La Shelle Co., 175 F. 902, 907, 41 L. R. A. (N. S.) 1002, 20 Ann. Cas. 1173, said: "The statute giving authors of copyrighted works the exclusive right to dramatize them must receive a rea-

sonably liberal application, or it will be wholly ineffective. As we have just pointed out, the adaptation of a story to the stage must necessitate changes and additions. Few short stories could be transformed into dramatic compositions without the addition of many new incidents. Unless the copyright statute is broad enough to cover any adaptation which contains the plot or theme of the story, it is wholly ineffective."

The picture under consideration in this appeal does not merely take ideas from the story which would be permissive, and not infringement. Holmes v. Hurst, 174 U. S. 82, 19 S. Ct. 606, 43 L. Ed. 904; Kalem Co. v. Harper Bros., 222 U. S. 55, 32 S. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285; Nichols v. Universal Pictures Corp. (C. C. A. 2) 45 F.(2d) 119. It substantially copies concrete forms that were conceived, developed, arranged, and put into shape by Witwer to express the ideas of his story. This is nothing less than the appropriation of the intellectual product of Witwer which is the entity that is protected by copyright law. Dymow v. Bolton (C. C. A. 2) 11 F.(2d) 690. In other words, the literary property that is safeguarded from appropriation does not lie in the ideas per se that are expressed or diffused by literature, but in the particular form in which ideas are embodied in the work of an author when such form is novel and unique.

There is a clear distinction between this case and those where the theme of a story has been so generalized by the author as to include commonplace incidents, historical events, or stock characters, or cases where it has been held that the representation of a spurious event cannot infringe an earlier description of the genuine happening. Compare Barbadillo v. Goldwyn (D. C.) 42 F.(2d) 881; Roe-Lawton v. Hal E. Roach Studios (D. C.) 18 F.(2d) 126. In the story here under consideration, the basic theme of being true to oneself, while old in literature, has been concretely developed and expressed in a way that is sui generis, and in the picture this fundamental theme is pictorialized by the substantial reproduction of Witwer's concept.

There are many "scorn to honor" stories earlier than "The Emancipation of Rodney" that center about and pertain to college athletic life and that have a romance interwoven in them. A number were introduced in evidence in the court below and have been considered. None of them, however, describe or contain the unique sequence of connected incidents present in the Witwer story and substantially reproduced in the Lloyd picture, and these distinctive and singular series of incidents that were originated by Witwer and uniquely described in his copyrighted story cannot be regarded as common property.

None of the stories or books in evidence contain or describe the incongruous, paradoxical, illogical situation of a nonathletic boy, inexperienced in football to such an extent that coach and players regarded him as incapable of participating in the game, and yet who, notwithstanding this status and reputation as substitute or regular player, overrides the coach and forces himself into a game, and who, bewildered, confused, forgetting signals, and practically unaided, runs to a touchdown and wins the game, as in "The Emancipation of Rodney." The fact that substantially the same story structure and series of events is found only in the picture removes any merit from defendant's argument that this situation consists of standardized forms of college stories and is therefore not original, but wholly within the public domain.

I conclude the discussion on this branch of the appeal with the statement that in my opinion this court should not reverse the trial court on the issue of infringement, but, on the contrary, should find no error in the decree of the court below to that extent.

Coming now to a consideration of jurisdictional questions raised by defendants in their assignments of error and discussed in their first brief, it is clear that plaintiff has modified her position relative to such issues since the trial and decision of this suit in the District Court.

The plaintiff based the right to recover profits from the picture prior to February 13, 1929, upon the asserted oral trust of November, 1919, as well as upon the written assignment of the copyright covering the story that was executed February 13, 1929, and the record before this court indicates that it was upon the existence of a trust relationship between the publishers, Street & Smith, Inc., and the author, Witwer, that the decree awarded pecuniary relief to plaintiff for infringements antedating the assignment.

In plaintiff's briefs in this court the following statements are made:

"The following is a general statement of our position in regard to the so-called jurisdictional questions raised by appellants in their brief: We contend that the complainant was the copyright proprietor and the owner of all claims for past infringements by virtue of the written assignment of 1929.

"In answer to appellants' contention that

the action can be brought only by the one who was the copyright proprietor at the time of the infringement and that complainant did not enjoy that status, we reply that the right to sue for past infringements was assigned by the written assignment of 1929.

"Since appellee relies squarely on the assignment of 1929, as passing the copyright and all existing rights, including the right to sue for past infringements, it is clear that Street & Smith, Inc., has no interest whatever in the copyright or in this controversy. It follows that Street & Smith, Inc., is neither a necessary nor a proper party to the action.

"We have previously pointed out that the oral trust is not the basis of appellee's right to recover for such infringements. The written assignment of the copyright 'together with all rights' then existing or which might thereafter come into existence, is the basis of appellee's right to recover and the court definitely so found.

"Appellee is not relying on the oral agreement as an independent source of title. She relies squarely upon the assignment of 1929, pleaded in the original complaint, which assigned the copyright 'together with all rights now existing or which may hereafter come into existence, except the right of magazine publication,' and which thus clearly passed the right to sue for past infringements. She relies upon the oral agreement and resulting trust merely as circumstances, to prove that it must have been the intention of Street & Smith, Inc., when they made the written assignment of 1929, to pass all claims for past infringements. We claim that the language used in the assignment is sufficient of itself but if there be any doubt as to this, we submit that the agreement of 1919 and the subsequent conduct of the parties, conclusively show such intention."

These statements of the present position of plaintiff in these appeals are tantamount to an abandonment of the trust theory as a basis for the recovery of any profits antedating the assignment, and this altered situation obviates the necessity of any discussion of the following points in the main brief of defendants: (1) That, since Street & Smith, Inc., the legal owner of the causes of action for infringements prior to the assignment of February 13, 1929, is not a party, the court had no jurisdiction over such prior infringements; (2) that, independently of the jurisdictional question, Street & Smith, Inc., as trustee of the alleged oral trust, is an indispensable party; (3) that the period of the statute of limitations should be computed

from July 9, 1930, the date of the amendment to the complaint introducing the trust, because that amendment brought in a new cause of action; and, (4) that the refusal of the trial court to grant a rehearing for consideration of new evidence bearing on the alleged trust of 1919 was an abuse of discretion. If it were not for the modified position of the plaintiff, I would consider it imperative to discuss these points and especially 1 and 2, on account of their importance in this suit.

We are therefore brought immediately to the question as to whether or not the assignment of February 13, 1929, from the then sole legal owner of the copyright justified the court below in awarding to plaintiff all profits of the picture for acts of infringement that occurred before the date of the assignment. The general rule is that a copyright may be assigned only by an instrument in writing signed by the proprietor of the copyright, 17 USCA § 42; Public Ledger Co. v. Post Printing & Publishing Co. (C. C. A. 8) 294 F. 430, and that a mere assignment of a copyright does not ex proprio vigore transfer to the assignee any cause of action for infringements that occurred prior to the assignment.

In other words, before an assignee of a copyright can maintain a suit for infringements that happened prior to the transfer of the copyright to him, the writing that is necessary to constitute him the copyright proprietor must contain clear and explicit language assigning causes of action for prior infringements. United States v. Loughrey, 172 U. S. 211, 19 S. Ct. 153, 43 L. Ed. 420.

The assignment in question reads:

"Assignment of Copyright.

"We, the undersigned, in consideration of the sum of One Dollar to us in hand paid and receipt whereof is hereby acknowledged, do hereby assign, transfer, grant and convey to H. C. Witwer of Los Angeles, State of California, that certain copyright taken out by us on the 20th day of November, 1915, registered as Class B, XXc., No. 343424 at the Library of Congress, Washington, title being 'The Popular Magazine, Volume 38, No. 5, November 20th, 1915, New York, N. Y.,' together with all rights now existing or which may hereafter come into existence except the right of magazine publication.

"Street & Smith, Inc.,
"By George C. Smith."

Leaving out of consideration for the moment the question as to whether or not this instrument is sufficient to constitute Witwer the "copyright proprietor," whose presence

in any infringement suit is indispensable under the Copyright Act, §§ 8–25, as amended (17 USCA §§ 8–25), it is clear that there is no express transfer of causes of action for past infringements in this assignment. It is only because of the clause, "together with all rights now existing or which may hereafter come into existence," appearing in the document, that any claim of a right to recover for past infringements can be made by the assignee. The document is entitled "Assignment of Copyright." No explicit mention is made in the title of the instrument or in the body of it of any causes of action for infringement. The subject-matter of the instrument is the copyright itself, and the words, "together with all rights now existing," are used strictly and solely with reference to the copyright itself.

My attention has not been called to any copyright case in which a similar assignment has been interpreted by the courts, and I have found none by an independent investigation. There are, however, many well-considered patent cases in which assignments containing like terms have been judicially considered, and I think that patent cases which construe assignments as affecting the assignee's right to recover for past infringements are applicable in interpreting the scope of this copyright assignment.

In the early case of Moore v. Marsh, 7 Wall. 515, 522, 19 L. Ed. 37, the Supreme Court said: "Grant that these views are correct, and it is clear that unless the plaintiff can maintain the action there can be no redress, as it is too plain for argument, that a subsequent assignee or grantee can neither maintain an action in his own name, or be joined with the patentee in maintaining it for any infringement of the exclusive right committed before he became interested in the patent. Undoubtedly the assignee thereafter stands in the place of the patentee, both as to right under the patent and future responsibility; but it is a great mistake to suppose that the assignment of a patent carries with it a transfer of the right to damages for an infringement committed before such assignment."

See, also, to same effect, Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U. S. 24, 39–41, 43 S. Ct. 254, 67 L. Ed. 516; United States v. Loughrey, 172 U. S. 206, 211, 212, 19 S. Ct. 153, 43 L. Ed. 420; Herman v. Detroit Shipbuilding Co. (D. C. E. D. Mich.) 295 F. 423, 424; Superior Drill Co. v. Ney Mfg. Co. (C. C. N. D. Ohio) 98 F. 734, 735; Gilmore v. Anderson (C. C. N. Y.)

38 F. 846; May v. County of Juneau (C. C. W. D. Wis.) 30 F. 241, 244, 245.

In May v. County of Juneau (C. C.) 30 F. 241, 244, which decision was later affirmed by the Supreme Court in 137 U. S. 408, 11 S. Ct. 102, 34 L. Ed. 729, the District Court, in construing a patent assignment as follows: "All the right, title, interest, claims, and demands whatsoever which the estate of said Edwin May, deceased, has in, to, by, under, and through the said improvements, and the letters patent and extensions thereof therefor aforesaid * * *" said: "The question is whether this assignment carries with it the right of action for infringements of the patent while Edwin May was the sole owner; and it seems clear, on principle and authority, that it does not. The language used refers only to the then present and future interest in this patent, and cannot be construed to cover rights of action which accrued to the patentee for infringements during his lifetime."

In a later case, United States v. Loughrey, 172 U. S. 206, 19 S. Ct. 153, 155, 43 L. Ed. 420, the Supreme Court cited May v. County of Juneau, supra, with approval, saying: "Neither a deed of land nor an assignment of a patent for an invention carries with it a right of action for prior trespasses or infringements. Such rights of action are, it is true, now assignable by the statutes of most of the states, but they only pass with a conveyance of the property itself where the language is clear and explicit to that effect. 1 Chit. Pl. 68; Gardner v. Adams, 12 Wend. [N. Y.] 297, 299; Clark v. Wilson, 103 Mass. 219, 223 [4 Am. Rep. 532]; Moore v. Marsh, 7 Wall. 515 [19 L. Ed. 37]; Dibble v. Augur, 7 Blatchf. 86, Fed. Cas. No. 3,879; Merriam v. Smith [C. C.] 11 F. 588; May v. Juneau County [C. C.] 30 F. 241; Kaolatype Engraving Company v. Hoke [C. C.] 30 F. 444."

I think that the language in the cases just referred to is more suggestive of a transfer of causes of action for past infringement than the wording in the assignment of February 11, 1929.

Plaintiff contends, however, that, if it be held that the general language used in the assignment is uncertain and not sufficiently clear and definite to transfer to Witwer causes of action for infringements prior to February 11, 1929, then, by resorting to the asserted oral agreement between Witwer and MacLean in November, 1919, and a written declaration of trust executed by Witwer about March 1, 1929, the intention of the par-

ties to the assignment to transfer such causes of action will clearly appear. Assuming that evidence dehors the assignment should be considered, I think that the evidence that we are referred to by the plaintiff cannot change the conclusion that the assignment does not and was not intended to transfer to Witwer any cause of action for an infringement of the copyright prior to February 1, 1929.

. I have early in this opinion mentioned the fact that the only evidence establishing the November, 1919, agreement between Witwer and MacLean in which it is claimed that the equitable right to the story was vested by Street & Smith, Inc., in Witwer was the testimony of the plaintiff, Mrs. Witwer. It was given entirely from memory ten years after the conversation between the two men took place. Coming completely as a surprise to defendants, they could not rebut it during the trial, but correspondence between Witwer and his attorneys with Street & Smith, Inc., at about the time when it is claimed the oral trust was created, as well as just before and some months after the assignment was obtained, that was subsequently discovered by defendants in New York and used by them on the petition for rehearing in the court below, and that is in the record before us, but that I do not consider necessary to set forth in this opinion, is at such variance with Mrs. Witwer's testimony concerning the time and terms of any agreement between Witwer and Street & Smith, Inc., concerning any retransfer by the publishers to Witwer of stories that he had sold to them, that no certainty exists relative to any such agreement. Under these circumstances the claimed agreement does not elucidate or clarify the terms of the assignment of February 13, 1929. And less helpful to the construction of the assignment contended for by plaintiffs is the declaration of trust executed by Witwer about March 1, 1929, and the circumstances surrounding its execution. The genesis of this instrument is interesting. On February 13, 1929, the then attorney for Witwer called on Street & Smith, Inc., in New York City, and obtained from them the assignment. The document was prepared by this lawyer. No other document was executed at that time. The day following, Street & Smith wrote a letter to the attorney addressing him in New York, and also telephoned to him there. In the letter they stated:

"In looking over the copy of the assignment of copyright which was handed to you yesterday, which was intended to convey to Mr. Witwer the copyright in his story, 'The Emancipation of Rodney,' which was published in the Popular Magazine for November 20, 1925, we find that the title of this story was not mentioned, but simply the Popular Magazine.

"As the intention was, of course, to convey to Mr. Witwer only the copyright covering his story, please return the two copies of assignment, and we will give you corrected copies at once."

The attorney did not return the assignment. He brought it to Los Angeles, Cal., and on March 1, 1929, in Los Angeles, wrote to Street & Smith, acknowledging receipt of the corrected assignment that they sent on February 14th, stating in his letter:

"The Assignment of the entire issue of the Popular Magazine published November 20th, 1925, was sent by me to the copyright office in Washington for recordation immediately after its receipt by me on February 13, 1929.

"After consulting the authorities, I am convinced that any lesser assignment might seriously jeopardize my client's rights to recover for infringement, because a copyright is not divisible and it is doubtful whether the assignment of a portion of a copyright is valid for any purpose."

The attorney inclosed with this March 1st letter the declaration of trust. The evidence shows that the assignment obtained by the lawyer on February 13, 1929, was sent from Los Angeles to Washington for recordation by another attorney on March 2, 1929, and that it was received for record in Washington on March 7, 1929. It is clear from the circumstances and correspondence surrounding the execution of this declaration of trust that it was conceived solely by Witwer's attorneys subsequent to the assignment, and that it was entirely a unilateral instrument. If any light whatever is shed upon the assignment by these subsequent circumstances, it is clearly to the effect that Street & Smith, Inc., intended to assign nothing but the copyright itself, and that only to a limited extent.

I think the assignment was sufficient to constitute Witwer the "copyright proprietor" subsequently to February 13, 1929, so as to invest him with the right to maintain suit for infringements occurring after that date without making Street & Smith, Inc., a party to the action. The reservation in the concluding words of the assignment, "except the right of magazine publication," retained in the assignor rights of a mere licensee, who is, under our construction of the assignment,

an unnecessary party to the infringement suit. This point is well disposed of by language in the opinion of the learned trial judge as follows: "Had Street & Smith, Inc., conveyed without the reservation, and then had Witwer assigned to it the right of magazine publication, we would have a situation exactly as the parties intended by this instrument, and entirely free of the objection urged by defendants. Why, then, should a similar situation not arise when the result is accomplished by the execution of one instrument instead of two? Suppose Street & Smith had assigned the right of magazine publication to some third party and then executed the instrument omitting the reservation, but with knowledge on the part of Witwer of the prior license, the assignment would then possess in fact the same asserted vice that it does now, but it would hardly be argued that Witwer in such a case would not have the right to maintain the suit for infringement of * * * his copyright in no way relating to magazine publication." (D. C.) 46 F.(2d) 792, 795.

My final consideration relates to the contention of defendants that the broad award of all the profits of the picture is under the circumstances shown by the record in this case so exorbitant as to be inequitable, and therefore that plaintiff should be allowed in lieu of profits such pecuniary relief as to the court shall appear to be just under section 25 of the Copyright Act, as amended by Act Aug. 24, 1912 (17 USCA § 25).

The part of the interlocutory decree that directs an accounting and awards profits requires each defendant to "render a full and true account and pay to the complainant Sadie S. Witwer, as administratrix of the estate of H. C. Witwer, deceased, any and all profits of whatever form or nature and howsoever accrued to or received or derived by each of them, directly or indirectly arising from any source whatsoever through or from or out of the production, presentation, exhibition, sale, lease or distribution of said motion picture photoplay, 'The Freshman,' from the 11th day of April, 1926, to the present time."

My conclusion that the plaintiff has no right to recover for infringements prior to the date of the assignment of February 13, 1929, makes it unnecessary to further discuss the question of the cross-appeal or the monetary feature of the decree that awards to plaintiff earlier profits derived by any of the defendants from the picture. The question for decision on the amount of money recovery is thus reduced to whether or not the plaintiff is entitled to any award of all the profits made by the defendants.

There is no claim by the plaintiff that any actual damages have been sustained or could be proved by reason of the infringement. The bill alleged no such damages and contained no prayer for the recovery of damages.

The sole relief sought by the complainant was an injunction to restrain defendants from infringing the copyright and an accounting from each defendant of all the profits and gains derived from the picture, and that the films of the picture be impounded and destroyed and also for reasonable attorneys' fees and the costs of suit.

There are admissions in answers of defendants that establish the earnings of large profits from the picture, and the record shows that these profits commenced about six months after the picture was first commercially exhibited. It took that period of time for the receipts from the picture to recoup defendants for the cost of the picture that amounted to more than $330,000.

Plaintiff claims that, because no damages are sought or desired by her, and that only profits have been shown, a court of equity is circumscribed and restricted to grant or to deny the specific monetary relief prayed for in the bill, and that, inasmuch as an injunction restraining infringement is granted, it necessarily follows in this case that plaintiff is entitled to all profits from the infringement and cannot be allowed damages in lieu thereof.

Section 25 of the Copyright Act as far as it is applicable to this case reads: "If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable: (a) To an injunction restraining such infringement. (b) To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement, and in proving profits the plaintiff shall be required to prove sales only and the defendant shall be required to prove every element of cost which he claims, or in lieu of actual damages and profits such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated, * * * and in the case of the infringement of an undramatized or nondramatic work by means of motion pictures,

where the infringer shall show that he was not aware that he was infringing, and that such infringement could not have been reasonably foreseen, such damages shall not exceed the sum of $100; * * * and such damages shall in no other case exceed the sum of $5,000 nor be less than the sum of $250, and shall not be regarded as a penalty. But the foregoing exceptions shall not deprive the copyright proprietor of any other remedy given him under this law, nor shall the limitation as to the amount of recovery apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him."

It is clear to me from the grammatical construction of section 25, as well as from the plain meaning of words in it, that an equity court is thereby invested with discretion in copyright infringement cases upon granting an injunction to administer such monetary relief as appears to the court to be just under the particular facts and circumstances of the suit. This construction of the section is also substantiated when its historical development is considered.

The claim of plaintiff that the "in lieu" clause in the section gives the court power to award a fixed amount only in suits where damages are sought, as distinguished from those where only profits are demanded, is contrary to and ignores the ordinary meaning of the statutory language, "in lieu of actual damages and profits."

Furthermore, the proposition that a suitor by demanding certain relief in an equity pleading can control the conscience of the chancellor and thereby prevent him from entering the decree that the equities of a case require does not impress one forcefully. The correct principle is aptly stated in David v. McRae (C. C. Wash.) 183 F. 812, 814, as follows: "The court is not restricted in granting equitable relief by the label which the complainant adopts for his pleading, nor by the phraseology of his prayer, but may render a decree for the kind of relief appropriate to the facts alleged and proved."

I think it is unreasonable to conclude that a suitor is to be denied just money relief under this statute simply because he does not in his bill of complaint allege damages, but prays only for an injunction and an accounting of profits. Although profits may be shown to have been received by the infringer, they may be wholly insufficient to discharge the pecuniary detriment sustained by the complainant. On the other hand, and as I think exists in this case, an award of all the profits resulting from an infringement, although the only money relief asked in the bill, may be so disproportionate to the injury to complainant and so excessive in amount as to be inequitable and unjust. It is clear that Congress intended by section 25 to adequately provide for both of these situations and to enable the court to meet the exigencies of each case by the exercise of sound judicial discretion in awarding pecuniary redress to the copyright proprietor in addition to injunctive relief.

Plaintiff argues that the provision in (b) of section 25, "But the foregoing exceptions shall not deprive the copyright proprietor of any other remedy given him under this law," makes it mandatory on the court to always award profits to complainant where he asks for them alone and does not seek or show damages. This argument emasculates, if it does not destroy, the important expression employed by Congress earlier in (b) of the section, "or in lieu of actual damages *and profits* [italics mine] such damages as to the court shall appear to be just." Every part of the statute shall be considered in arriving at a proper construction of it, and, unless necessary, an interpretation that renders a part meaningless should be avoided. Congress intended to make clear that, while the court in the exercise of sound discretion could fix arbitrary damages in lieu of actual damages and profits, the copyright proprietor shall not by reason of such exercise of discretion by the court be deprived of such other remedies as injunction, impounding, and destruction of infringing material, attorney fees, and costs that are provided for in the Copyright Law. 17 USCA §§ 25, 27, 36 and 40. Such a construction of the Copyright Act renders all component parts of it effective and eliminates any unnecessary inconsistency in its provisions.

An examination of the history of section 25 discloses that prior to the Copyright Act there was no direct statutory authority for awarding profits to a suitor in cases of copyright infringement of a story by dramatizing it, and not until 1912 were motion pictures and photoplays specifically made the subjects of copyright legislation. It is significant that at the same time that motion pictures were so classified the provisions for fixed arbitrary damages in lieu of actual damages and profits in infringements of undramatized and nondramatic works by motion pictures were added to section 25. This manifests an intention to deal with infringement

cases involving motion pictures in a different manner than had been employed with regard to other and earlier infringing instrumentalities. The differentiation was apparent and necessary, because at that time motion pictures were all silent, and, while a plot or story structure could be plagiarized or pirated by the cinema, it was of an entirely different character than infringements of literary works by the spoken drama. It is reasonable to infer that the national Legislature had these differences in view when it framed the arbitrary damage provisions in section 25 and also made allowances in the section for innocent and unintended infringements by means of motion pictures, and intended thereby to enact a statute that would enable the court of equity to adopt its processes to meet the specific requirements of concrete cases independently of the precise demands of suitors.

The plaintiff cites the case of Dam v. Kirk La Shelle Co. (C. C. A. 2) 175 F. 902, 41 L. R. A. (N. S.) 1002, 20 Ann. Cas. 1173, to the point that the trial court had no discretion, and that an award of profits by it was a necessary incident to the injunction granted in the court below. The Kirk La Shelle Case was decided in the trial court before the passage of the present section 25 of the Copyright Act on March 4, 1909, and at a time when the statutes contained no such provisions as they now contain authorizing the court to award a fixed amount in lieu of actual damages and profits. All of the earlier suits in which profits had been allowed were brought under general equity jurisdiction and in accordance with the historic methods of chancery courts (Belford v. Scribner, 144 U. S. 488, 12 S. Ct. 734, 36 L. Ed. 514; Callaghan v. Meyers, 128 U. S. 617, 9 S. Ct. 177, 32 L. Ed. 547), and cannot be made applicable to this suit which was brought under the express authority of a statute that invested an equity court with plenary power to exercise discretion in awarding fixed damages in lieu of actual damages and profits. The inapplicability of Dam v. Kirk La Shelle Co. to this suit is clearly shown by the statements in the main opinion of Judge Noyes in that case as follows: "Unless the complainant is entitled to all the profits arising from the production of the play, she is, as a practical matter, entitled to no pecuniary recovery at all. * * * If in a case like the present an author can not hold the theatrical company as his trustee and accountable for all the profits from the play, then it necessarily follows that all copyrighted but undramatized books and stories may be appropriated and used with impunity."

Such a condition suggested by Judge Noyes is no longer possible, because by the express terms of section 25 substantial pecuniary relief is provided for, although profits are disallowed and no actual damage can be shown.

In Turner & Dahnken v. Crowley, 252 F. 749, 754, this court was reviewing an award of damages made by the trial court under the second paragraph of (b) of section 25 of the Copyright Act which provides for a fixed allowance of $1 for each infringing copy of a song that is made by, sold, or found in an infringer's possession. The complaint asked for an injunction, profits, and damages. It was proved that a copyrighted song had been infringed and 7,000 infringing copies were found in the possession of the infringer. The complainant was awarded $7,000 or $1 for every infringing copy. In reversing the decree the court said: "Appellee offered no proof of actual loss or of profits, but we gather from the testimony that at a retail price of 15 cents a copy for the song the profit to the plaintiff would not have exceeded 8 cents per copy. If, therefore, the plaintiff had received 8 cents per copy upon 7,000 copies found in the possession of Turner & Dahnken, her total damage would have been $560, which we think would be a fair estimate. Plaintiff said that she expected and authorized orchestrations of her song to be used, but did not authorize use of it as made by defendant. The allowance of $7,000, or $1 per copy of the song and music, seems to have been based upon the view that $1 per copy is a fixed sum, to be allowed under any circumstances of infringement after notice. But, as we do not so construe the law, the duty of the court was to award damages as justified by the nature and circumstances of the case as developed upon the trial."

The principle of Turner & Dahnken v. Crowley that the trial court has discretion under section 25 to make an award commensurate with "the nature and circumstances of the case as developed upon the trial" is applicable to this suit, notwithstanding that the demand of plaintiff is solely for profits instead of other monetary solace as an incident to the injunction.

My conclusion is that, under all the facts, circumstances, and equities of this case, any award of all the profits is inequitable and should not be allowed to the plaintiff. Although I agree with the court below that the

picture copies material and substantial parts of the story and thereby constitutes infringement, I do not think that one is the counterpart of the other; in fact much of the value and merit of the picture has no relation whatever to the story, and many of the episodes and sequences in the picture are in no way suggested by Witwer in the story.

The personality of Lloyd; the radio scenes in the Lamb home; the Lester Laurel episode and the recurring jig step; the crossword puzzle scenes; the station sequences; the automobile incidents; the auditorium scene with cat and kitten; Harold's speech; the ice cream treat sequence; the scenes of Peggy sewing on buttons and at the hotel; the football practice scenes with their bulldog, tackling dummy, and comic appurtenances; the purchase of the dinner suit; the tailor and dizzy spells; the cad's unwelcome attentions to Peggy and the fight between Harold and the cad; the stretcher scene at the football game, as well as many other "gags" that are interspersed throughout the picture, have no possible relation to or connection with the story. It is true that the independently conceived portions of the picture are inextricably intermingled with the infringing material from the story so as to make impossible any segregation of it; nevertheless, consideration of the great amount of original matter in the picture should be had with other matters that will be presently mentioned in estimating the monetary relief to which the plaintiff is entitled.

The dormant and dilatory attitude of Witwer himself is a powerful reason for denying to him an award of all the profits of the picture. He knew at least several weeks before actual photographing of the picture commenced that the Lloyd organization was planning to make a college picture similar to his story at great expense. He had given them permission to use "gags" of his story that he had told him in making the picture, and, while it is true that immediately after the first public exhibition of the picture he served the Harold Lloyd Corporation with notice of plagiarism and commenced his suit in the state court about three months thereafter, he did nothing further to stop the exhibition or distribution of the picture until he filed this suit in the court below on April 11, 1929, about three and one-half years from the production of the picture. The delay was inexcusable and apparently intentional for the purpose of inducing defendants to exploit and popularize the picture so that enormous profits might be accumulated solely at their expense and for the sole benefit and advantage of the complainant. I think that the conduct of Witwer is equivalent to laches and is of such character as to preclude plaintiff from recovering all the profits from the picture.

The principle applicable to this situation is that declared by the Supreme Court in Johnston v. Standard Mining Co., 148 U. S. 360, 13 S. Ct. 585, 589, 37 L. Ed. 480, as follows: "Under such circumstances, where property has been developed by the courage and energy and at the expense of the defendants, courts will look with disfavor upon the claims of those who have lain idle while awaiting the results of this development, and will require * * * prompt assertion of plaintiff's rights."

See, also, West Publishing Co. v. Edward Thompson Co. (C. C. A. 2) 176 F. 833.

In connection with the question of money relief, it is proper to direct attention to the fact that no notice of infringement of any kind was served upon or given to defendants Harold Lloyd or Pathe Exchange, Inc., until service of process in this suit was made upon them, and, in the admeasurement of the pecuniary liability of defendants, this fact is of importance under (b) of section 25 of the Copyright Act (17 USCA § 25).

The interlocutory decree of the court below as far as it enjoins and restrains defendants Harold Lloyd Corporation, Pathe Exchange, Inc., and Harold Lloyd, and each of them, their licensees, agents, servants, attorneys, and employees, and all persons, firms, or corporations acting under or through them, from producing, reproducing, presenting, representing, issuing, reissuing, selling, leasing, distributing, giving away, or exhibiting the motion picture photoplay "The Freshman," or any part or portion thereof in motion pictures or otherwise, and from causing the same to be produced, reproduced, represented, issued, reissued, sold, leased, distributed, given away, or exhibited in motion pictures or otherwise, and from producing, reproducing, presenting, representing, selling, leasing, distributing, giving away, or exhibiting in whole or in part in motion pictures or otherwise complainant's story, "The Emancipation of Rodney," or any colorable dramatization, imitation, or adaptation thereof, and that orders defendants Harold Lloyd Corporation, Pathe Exchanges, Inc., and Harold Lloyd, and each of them, to deliver up for destruction, and that orders the United States Marshal to destroy upon delivery to him all positive and negative motion picture films under defendants' control or the

control of any of them upon which is printed or reproduced or represented said motion picture photoplay "The Freshman" or any part or portion thereof, or any part or portion of the story "The Emancipation of Rodney," and that awards attorneys' fees and costs should be affirmed.

All other portions of the interlocutory decree should be reversed, and the cause remanded to the court below for further proceedings not inconsistent with the foregoing opinion.